## Case No. 8,004.
### The LA MANCHE.
[2 Spr. 207;[1] 25 Law Rep. 585.]

District Court, D. Massachusetts. June, 1863.

DAMAGES—PRIZE—ACTION AGAINST CAPTOR—PROBABLE CAUSE FOR CAPTURE.

1. Captors are not liable for damages in a case where the vessel captured presents probable cause for the capture, even though she was led into the predicament in which she is found, involuntarily, and by the mistakes of the revenue officers of the captors' own government.

2. What constitutes probable cause, which will justify a capture.

In admiralty.

R. H. Dana, Jr., U. S. Atty., for captors.
H. F. Durant, for claimants of the ship.
Causten Browne, for claimants of the cargo.

SPRAGUE, District Judge. This ship was taken on the high seas by the United States ship-of-war Ino, commanded by Captain Devens, and sent in for adjudication upon the supposition that she had come from a Confederate port in violation of the blockade. She arrived at this port on the 28th day of August, 1862. The cargo was so far unladen as to exhibit the character of the whole; and it having been ascertained, by due inquiry, that the vessel had sailed from New Orleans with this cargo on board, as set forth in her documents, the vessel and cargo were, on the 27th day of September, 1862, restored to the claimants with the consent of the captors. The respective owners of the vessel and cargo duly interposed claims for costs and damages, consequent upon the arrest and detention of their property. Upon this claim, evidence has been taken and fully heard, and able and elaborate arguments have been presented by the counsel on both sides. It appears that this was a French ship, owned by the claimants, Messrs. Lerou Fréres & Co., of Havre, and that her officers and crew were Frenchmen. In the month of June, 1862, she was at St. Jago de Cuba. She there learned that New Orleans had been opened to foreign trade, by proclamation of the president of the United States, and sailed for that port, where she arrived on the 7th day of July, and soon afterwards discharged her cargo, and subse-

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

quently took on board a cargo consisting of 286 hogsheads of tobacco and 20,000 staves, which were shipped and owned by the claimant, Simon José Campo, of Valencia, in Spain.

She left New Orleans on the 31st day of July, bound for Cadiz, and proceeded on her voyage, without interruption, until the 23d day of August. On that day, at about ten o'clock in the forenoon, she was discovered by the Ino. The course of the La Manche was then east by south, and that of the Ino south-southeast, which courses they continued until about twelve o'clock, and until the La Manche had just crossed the bows of the Ino several miles distant. The La Manche then slightly changed her course, and set her starboard topgallant and lower studding-sails. The Ino then changed her course, and made some additional sail in pursuit, and at about two o'clock she fired a gun, and the La Manche immediately hove to. She was then boarded by an officer from the Ino, who, after examining her papers, carried them to his own ship, to be submitted to his commander. Captain Bourhis, the commander of the La Manche, voluntarily went with him. There a careful examination was made of all the papers by Captain Devens and by several of his officers, and some conversation was had with Captain Bourhis, and explanations asked. No person belonging to the La Manche could speak or understand English. One of the officers of the Ino had some knowledge of the French language, but it was not such as to enable him adequately to interpret oral communications or translate written documents. There is no doubt that Captain Bourhis promptly and fairly produced all the papers and documents on board his vessel, and frankly and truly answered all the questions that were put to him, so far as the imperfect means of communication would permit.

It now becomes necessary that we should look at the circumstances which caused the arrest of the La Manche, as they presented thmselves to Captain Devens and his officers. The principal ground of the arrest and detention was the condition of some of the documents found on board the La Manche. The Ino sailed from Boston on the 18th August. 1862, and on the 23d of that month, in about latitude 38° 19' north and longitude 69° 6' west from Greenwich, overhauled and boarded the La Manche as before stated. It is agreed by counsel that this was in the Gulf Stream, and nearly off the mouth of Delaware Bay. I have not examined the chart myself. Among the papers of the La Manche, there were three purporting to be from the custom house at New Orleans, which received particular attention and scrutiny from Captain Devens and his officers. They were a manifest, bill of health, and clearance. These were all in English, and made out by filling the blanks in printed forms. On one side of the document called the manifest was a report or schedule of the cargo, duly and correctly made out. On the other side was a printed form of an oath which was taken and subscribed by the master of the La Manche, and certified by W. C. Gray, as deputy collector. In that printed form of oath were found these words: "I also swear, that I do verily believe that the duties on all the foreign merchandise, therein specified, have been secured according to law, and that no part thereof is intended to be relanded within the Confederate States." This clause against relanding in the Confederate States arrested attention, and excited strong suspicions in the minds of the captain and officers of the Ino. They had several of them been shipmasters, and it was apprehended that such a document could have been furnished only by a Confederate custom house, in a Confederate port, and that the vessel had run the blockade.

The officers of the Ino had other reasons for doubting the genuineness of these documents. Knowing that New Orleans was in the military occupation of the United States, by its land and naval forces, they supposed that the documents, if genuine, would bear the signature and authentication of some officer of the army or navy, yet no such signature appeared. The oath to the manifest was certified by W. C. Gray, as deputy collector. This name was new to Captain Devens and his officers. They had no knowledge whether any such person was connected with the custom house in New Orleans. There was an apparent defect or irregularity as to the signature of the civil officer of the customs, called the naval officer. His name nowhere appears in full. On the clearance are the letters "E. S. H.," followed by the words "Naval Officer." In the bill of health, the printed words "Naval Officer," in the margin, had been erased by drawing a pen through them, and at some distance below were the letters E. S. H.

The manifest made no mention of a naval officer, and bore no such letters or initials. Captain Bourhis was asked to explain how the clause respecting relanding cargo in the Confederate States came to be in his manifest, and why the documents had no signature of a naval officer. But he had no explanation to give, and seemed to have no knowledge upon the subject. He appeared also, upon inquiry, to have no knowledge that General Butler was in command in New Orleans. or of any ships-of-war of the United States being there. But this apparent want of knowledge respecting our military commander may be attributted to the want of a common language. There were no adequate means of intercommunication.

Another circumstance which attracted the attention of the captors was the amount of cargo as stated in her manifest, compared with the apparent capacity of the vessel, as seen at sea. Upon examination by the boarding officer, it was found that not only was the hold filled up to the combings of the hatches, but that staves were stowed in the cabin and on deck.

The burden of the La Manche, as stated in the clearance, was 401 tons; and, so far as her hull could be seen above water, her construction appeared to be adapted to carrying a large cargo for her tonnage, and it seemed to the officers of the Ino that 286 hogsheads of tobacco and 20,000 claret staves, the cargo stated in the manifest, would not have filled such a vessel; and, further, that, if filled with goods of that description, she ought to have been deeper in the water. And they inferred that she had on board some other and lighter goods. In this, the officers of the Ino were mistaken. After being brought in, the La Manche was put into a dry dock; and it was then ascertained that her construction below the water-line was sharp, with a great deal of dead rise, adapting her to sailing, but not to carrying well, and that these hogsheads could not be stowed to advantage, and that she was, in fact, entirely filled by the cargo set forth in her manifest.

It further appeared, from her log-book and papers, that she left New Orleans on the 31st day of July, and had thus been twenty-three days in making the passage to the place where she was boarded. This appeared to the officers of the Ino to be a very long time for the distance made; but what seemed still more remarkable was, that during all that time she had not, according to her log-book, seen or spoken an American cruiser.

It has already been stated that the La Manche somewhat changed her course, and made more sail about the time she crossed the bows of the Ino. This tended to strengthen the suspicions of the captors. The La Manche, when first seen, bore about four points on the weather-bow of the Ino, the wind being south-westerly, and the course of the Ino being south-south-east, and that of the La Manche east by south. The weight of evidence is, that the La Manche put away only about one point, or between one and two points, and set her topmost and lower starboard studding-sails, and that this change of course was about the time she crossed the bows of the Ino, that is, when she intersected the line on which the Ino was sailing. Until that line was reached, the courses of the two vessels converged; after it was crossed, they diverged, and, if both vessels had kept on, the distance between them would have been constantly increasing. By putting away, the La Manche lessened the divergence. But it was supposed that this was intended to enable her to set all her starboard studding-sails, so that they would draw, and thus increase her speed. The Ino then changed her course in pursuit, and afterwards overhauled her, as before stated.

The last entry in the log-book of the La Manche was on the day of the capture, and related to her being pursued and overhauled. It was in French, and there seems to have been some misapprehension, or at least doubt, among the captors, as to its precise meaning. It is, however, of very little consequence.

Two other suggestions are made in the evidence; namely, that the place where the La Manche was found was further northward than she ought to have been if really bound for Europe, and that in the bill of lading a blank for the year was not filled; the printed figures "186 ," having a blank after them, which should have been filled with a figure 2, or some other. These, however, are unimportant.

To judge Captain Devens' conduct rightly, we must see how the circumstances were presented to his mind, without the information which has since been acquired. The document called the manifest, particularly in the printed declaration and oath, not only contained that startling clause against relanding the cargo in the Confederate States, but was, in its general form and construction, quite different from any used at the Boston custom house, and also, it is believed, from those used in other ports of the United States. The document bears upon it marks of a Confederate origin, warranting not only a strong suspicion, but an actual belief, that it came from a Confederate custom house. Indeed, that theory has been adopted by the counsel on both sides. They suppose that all the printed part of this document was of Confederate origin; that it was a form adopted and used by the rebels while they were in possession of New Orleans, and was by them left there, and was made use of for this vessel, without erasing the clause respecting the Confederate States, or making any addition or alteration substituting or naming the United States. This theory is adopted after it has been ascertained that this document was actually obtained at New Orleans, and it is certainly extraordinary that an officer of the customs should furnish or authenticate a Confederate blank without erasing the part which marked it as a Confederate document, or adding any thing to show that it was issued in the name of the United States. But the doubt presented to Captain Devens was, whether this document had been actually furnished by the United States custom house at New Orleans.

That doubt could not properly be solved without a further inquiry, which could not then be made upon the ocean. Further than this, neither of the three documents, purporting to come from the custom house at New Orleans, had the signature of the naval officer. One of them, indeed, had certain letters, which might be initials, before the words "Naval Officer;" and the other had the same letters, or initials, in the margin, above which the printed words "Naval Officer" had been erased by drawing a pen through them. These peculiarities, and the want of due authentication by the naval officer of the custom house, or any military officer at New Orleans, might well strengthen the suspicion and doubt created by the manifest.

To this condition of the papers were added

the other circumstances already referred to, viz., the disproportion between the cargo and the apparent carrying capacity of the vessel, the length of her passage, and that, too, without having seen an American man-of-war, the changing her course, and making additional sail. These were untoward circumstances, calculated to strengthen the unfavorable impression which the condition of the documents had created. These circumstances, thus combined, not only warrant the belief that Captain Devens, in sending the La Manche in for further investigation, acted with honest intentions and from a sense of duty; but they go further, and relieve him from any imputation of negligence, or rashness, or other culpability.

On the other hand, there is now no doubt that the La Manche was engaged in a lawful voyage, with the most innocent intentions; that her whole cargo was taken on board at New Orleans, and that she sailed from that port directly to the place where she was captured. On being boarded, Captain Bourhis promptly produced all his papers, and, on doubts arising, voluntarily accompanied the boarding-officer to the Ino, and there fairly and frankly answered all questions put to him, as far as they could be understood, and he could render his answers intelligible. All his French documents were perfectly correct, and there is no reason to doubt tnat he verily believed that those in English were equally so. How it happened that such documents were obtained by him at New Orleans does not even yet appear. What part the consignees or agents of the ship had in furnishing or procuring the printed forms and filling the blanks, or what part the custom house officers had therein, we do not know. As to her change of course and setting starboard studding-sails, it is proper to remark that a neutral merchant ship has a right to endeavor to keep out of the reach of a man-of-war, to prevent the inconvenience of being overhauled and searched. She must, indeed, heave to upon the firing of a gun, within proper distance, and this was promptly done by Captain Bourhis. If, therefore, this change of course had been for the purpose of keeping away from the Ino, it could not have been imputed to him as a fault. But Captain Bourhis, in his examination, testified that such was not the purpose. He says, that at twelve o'clock, upon taking an observation, it was found that the course she was then sailing was not perfectly correct, and that, in order to make it so, she was put away about one point; and I see no sufficient reason why this explanation should not be accepted as true.

The La Manche, having committed no offence. was, while pursuing a lawful voyage, forcibly arrested and sent into this port. Is Captain Devens, the captor, to be held personally responsible for the damages sustained by the owners? This involves two inquiries. First, did the circumstances, as they were presented to Captain Devens, constitute a case of probable cause, without regard to their origin? Second, if they did, does the fact now known, that the suspicious papers actually came from the custom house at New Orleans, deprive the captor of the protection of probable cause?

As to the first, the term "probable cause" has received various definitions or expositions. It is well settled that it is not necessary, in order to constitute probable cause, that the circumstances should be such as to make a prima facie case for condemnation. It is important to keep this in view. Locke v. U. S., 7 Cranch [11 U. S.] 339; The George [Case No. 5,328]. As to what is sufficient to constitute probable cause, see The George [supra]; The Marianna Flora, 11 Wheat. [24 U. S.] 1; The John, 2 Dod. 336; The Aline & Fanny, 10 Moore, P. C. 501; The Mary, 9 Cranch [13 U. S.] 126; The Maria, 11 Moore, P. C. 287. See, also, other cases hereafter referred to.

An exposition of the highest authority is found in Locke v. U. S., 7 Cranch [11 U. S.] 339, where the supreme court declared that the terms "probable cause," in all cases of seizure, have a fixed and well known meaning, that they import a seizure made "under circumstances which warrant suspicion." It has been held that the same rule applies in cases of prize. The George [supra]. See, also, The Mary, 9 Cranch [13 U. S.] 126.

There are many cases in which the court speak of there being or not being grounds of suspicion, as if that were the criterion by which to determine the liability of the captor. I presume, however, that it is not to be understood, that every ground of suspicion, however slight, will justify the captors. Maley v. Shattuck, 3 Cranch [7 U. S.] 489.

There are many cases in which doubts as to the law have been held to justify a capture or seizure. Some of these will be cited in another connection. One of the strongest is U. S. v. Riddle, 5 Cranch [9 U. S.] 311. I think it may at least be said, that if, under a true construction of the law, all the facts within the reach of the captors present good grounds for substantial doubt as to the guilt or innocence of the vessel, the captors will be exempted from liability. Circumstances of extreme delay, danger, and damage may be supposed, which may constitute an exception to this rule. But if there be reasonable doubts, for the solution of which it is reasonable, under the circumstances, to send the vessel in for investigation, then there is what the law denominates probable cause.

It is proper for the captor to ask explanations from the captured, and, if satisfactory, it is well; but he is not bound to take their statement of extrinsic facts as true. The Apollo, 4 C. Rob. Adm. 160. Now, looking at all the facts within the reach of the captor, at the time the La Manche was arrested, I think that they presented good ground for substantial doubts whether she had sailed from New Orleans, or from some Confed-

erate port in violation of the blockade. In addition to the extraordinary and unaccountable character of her papers, there was the disparity between the cargo set forth in the manifest and the apparent capacity of the vessel, the length and course of the passage from New Orleans without speaking an American cruiser, and her changing her course and making more sail, and continuing the same during the chase. This last circumstance, although not to be imputed as a fault, still was unfortunate. Such circumstances have been held, in a very recent case, to strengthen the suspicions arising from other causes, and to combine with them in justifying a capture. In The Aline & Fanny, 10 Moore, P. C. 501, a neutral ship was sent in for adjudication solely on suspicion of an attempt to break the blockade of a port in Finland. The privy council, in giving their judgment, hold the following language: "Here there were appearances created by the act of the ship herself, which might justly excite suspicion. She had come across the Gulf of Bothnia, at a point where, as we understand, the gulf is between fifty and sixty miles broad, from the Swedish towards the Finland coast; she was not in the straight course from Umea to Haparanda. When she was descried and followed by her majesty's ships then lying off the port of Jacobstadt, she did not slacken sail, but pursued her course, till she was brought-to by a shot from the Tartar, after what seems to have been a chase of above two hours. Surely these circumstances were abundantly sufficient to excite the just suspicion of the captors as to the character and purpose of this vessel, and to afford probable cause for capture." There is another view. It has been held, that, if the case be one for further proof, there is probable cause. But the converse is not true. That is, although restitution be ordered without further proof, it does not follow that the sending in was improper. The George [Case No. 5,328]; The Mary, 9 Cranch [13 U. S.] 126; The Apollon, 9 Wheat. [22 U. S.] 372; The Apollo, 4 C. Rob. Adm. 165.

By further proof is meant that which is derived from some other source than the vessel and cargo, and the papers and persons found on board. In this case, if the first hearing had been had before time enough had elapsed to obtain information from New Orleans, and either party had moved for leave to obtain evidence from that place, 1 should have granted that motion.

I should have deemed the doubts arising from the papers to be strong enough to render it proper to obtain such evidence, ab extra for their solution, that is, for further proof. No hearing upon the preparatory evidence alone was had, because neither party moved for it. When information had been obtained respecting the clearance from New Orleans, and the cargo had been un-laden, it was so satisfactory, that is, the doubts and difficulties presented by the preparatory evidence were so effectually removed, that the counsel for the captors at once consented to an order of restitution, and the vessel and cargo were delivered to the claimants. I am of opinion that the circumstances as they were presented to Captain Devens, if we have no regard to their origin, constituted a case of probable cause.

This brings us to the question whether the fact now known, that the suspicious papers actually came from the custom house at New Orleans, deprives the captor of the protection of probable cause. I have no doubt that the counsel for the claimant is right in considering these papers to be the main cause of the La Manche being sent in, and that, without this ground of unfavorable suspicion, she would not have been detained. This is shown, not only from the comparative force of the circumstances themselves, but by the direct testimony of Mr. Winslow, an ensign, and still more strongly by the written instructions given by Captain Devens to the prize master who brought her in.

Here let us see what was done at New Orleans. That these papers were authentic, there is no doubt. But how it happened that such papers were furnished or sanctioned by the custom-house officers has not been shown. The manifest is far the most important. This document purports to have been made out by the master of the La Manche. It contains, in the first place, a schedule of his cargo, which must have been made out by him or his agent, and, in the next place, the oath taken and subscribed by him. This oath was administered by the collector. It may be that the consignee or agent had this printed form in his possession at the time the Confederate officers left the custom house, and made use of it on this occasion; or it may have been left by the rebels at the custom house, and carelessly taken by the United States officers, and furnished to Captain Bourhis. He did not understand English, but he might have employed, and doubtless did employ, agents who understood the language and the course of business, and whose acts must be deemed his acts. It is certain the master of the La Manche had some share in preparing and receiving these documents, and that the custom-house officers received and authenticated them. His participation in the errors may have been quite excusable; still it is true that he was a joint actor. It was at least possible for him, as for the custom-house officers, to have examined and ascertained the condition of these papers. On the other hand, Captain Devens had no participation whatever in the mistakes made at New Orleans, and could not by possibility have prevented them. Why, then, should he be made personally responsible for the consequences of those mistakes, and that,

too, in favor of the La Manche, whose agents participated in them. He was compelled to act upon the facts within his reach. From the appearances and circumstances presented by the La Manche herself, he, after due consideration, came to the conclusion that there was probable cause for sending her in. This judgment was correct. And it is to be borne in mind that it was the only judgment which he was required to form, being that upon which alone he was required to act. We have no occasion to inquire, because it is immaterial, whether he had formed an opinion as to a final condemnation. For it was not necessary that there should have been a primâ facie case for condemnation. All that he had occasion to determine, and all that he did determine, so far as we know, was that there was probable cause; and, being correct in this, it cannot be said that he made any mistake whatever. It does not seem consonant to natural justice, that he should be made the victim of the mistakes of others, even if the claimants' agents had been equally removed from any participation in them.

It has been contended in behalf of the claimants, that this vessel was invited to New Orleans by proclamation of the president, that she had a right to rely implicitly upon the correctness of documents furnished or sanctioned by custom-house officers; that, in doing so, no fault can be imputed to her by any of the United States authorities; that, while pursuing a lawful voyage, she was arrested by an officer of the United States, and that our government is bound to indemnify her for the injury thus sustained; and it is further insisted that, if the government be liable, the captor is liable. Now it may be that the government of the United States ought to indemnify these claimants. I am by no means prepared to say that it should not. But, if it ought to do so, it does not follow that the captor is liable to the claimants. The obligations of the government, and the liability of the captor, are distinct questions; and it is the latter one that I am called upon to decide.

The counsel for the claimants insists that their view is sustained by authority. The case chiefly relied upon is The Ostsee. decided by the privy council in 1855, reported in 9 Moore, P. C. 150. In that case, the Ostsee, a neutral ship, sailed from Cronstadt in May, 1854, and a few days afterwards was captured by a British cruiser, solely on the ground of a breach of blockade. After being libelled, the vessel was restored by consent of the captors, the only contest being whether they should be required to pay to the claimants costs and damages. This question the high court of admiralty decided in the negative. The privy council, on appeal, reversed that decision. The only ground of capture was an alleged breach of blockade, in sailing from Cronstadt; and yet, strange to say, no

blockade existed at the time of her sailing, nor at the time of her capture, nor until three weeks afterwards. There was no blockade, even by proclamation, or on paper. The vessel was proceeding in an innocent manner, on a lawful voyage, not only without reasonable cause for detention, but without presenting one circumstance of suspicion. It was, indeed, contended that a certain document was wanting; but the court held that that assertion was not proved, and was to be disregarded. The sending in must have been merely from the hope that something might be discovered, upon an investigation in a prize court; yet, in such a case as this, the high court of admiralty refused to award costs and damages against the captor, because it was said there was some confusion in the minds of the British officers as to the blockade.

Now, if such confusion existed, it was in no degree attributable to the neutral ship. The privy council (page 171) say: "We find no trace, in the evidence, of any confusion or doubt as to the period when the blockade commenced; and, if there had been, it was a confusion created only by the acts and in the minds of her majesty's officers, and could not. therefore, according to the principles which we have collected from the authorities. have afforded any answer to a neutral perfectly innocent of all fault, and not by any act or neglect of his, voluntary or involuntary, exposed to any suspicion."

There is really more of contrast than resemblance between the facts in The Ostsee and those in the case now before me. In The Ostsee there was no probable cause, and, if the captor supposed there was, he made a gross mistake. Here, the circumstances presented by the vessel constituted probable cause, and the captor formed a correct judgment.

Another ground taken in behalf of the captor of the Ostsee was, that he acted under the order of Admiral Napier. This defence was not sustained by the court. It was inconsistent with the doctrine that an illegal act cannot be justified by the order of another, even if that other be a military superior. Mostyn v. Fabrigas, 1 Cowp. 180; Mitchell v. Harmony, 13 How. [54 U. S.] 115. The orders of the admiral were not regarded by the court as the orders of the government.

An authoritative exposition of the true meaning and extent of the opinion in The Ostsee has been made by the same court in the subsequent case of The Aline & Fanny, 10 Moore, P. C. 500. where it is said: "This must depend upon the question whether this ship has brought herself within the class within which the Ostsee, in the opinion of the judges who decided that case, was clearly brought; that is to say, in the language there used, of a capture 'where not only the ship was in no fault, but she is not by any act of her own, voluntary or involuntary, open to any fair grounds of suspicion.' "

The counsel for the claimants have not relied so much upon the point decided in The Ostsee, as upon the remarks of the court on page 164, where it is said, that, in case of error occasioned by the proceedings of the government, the captor is liable; and, as a reason for this, it is said that the state is liable, "and if the state could not urge its own mistakes as a justification of its own wrong, neither, it should seem, should individual citizens be permitted to do so." That this is a mere dictum is evident. On page 177 it is distinctly said that the government had not done any thing to mislead the officers. This dictum is not to be understood as declaring that, if the state be liable, every citizen is liable, but only such as have participated in the error; that is, captors who have acted under a mistake into which they have been led by the proceedings of the government. This is evident from all the authorities referred to, as will be seen presently. And it is to be remarked that this dictum does not profess to advance any new doctrine, but merely to give the result of the authorities.

In the first place, this dictum is in opposition to several authorities, and is not sustained by a single English decision cited, and by only one American decision. In the second place, it has no application to the case now before me. The first English case referred to, in the opinion in The Ostsee, is The Acteon, 2 Dod. 48. This was greatly relied upon. There, an American vessel, sailing under a British license, was captured and destroyed by a British cruiser. The judgment pronounced by Sir William Scott shows that this vessel, so far from presenting any reasonable cause, hardly furnished any pretext for the capture and destruction. It was suggested, in palliation of this act of the British commander, that he apprehended that the Acteon, if permitted to proceed on her voyage, would have carried to the United States information which would have been used to the injury of Great Britain. The truth is, that the British officer had committed a palpable outrage. Sir William Scott did justice to the claimants by awarding costs and damages, but manifested a strong desire to screen Captain Capel from obloquy, and to that end threw in many soft words, and volunteered the gratuitous supposition that he acted under orders from his government. No such orders were shown in defence. If they had been, we cannot doubt that they would have been held to be a perfect shield against any liability to foreigners. Such has been the British doctrine, and it was illustrated in the case of McLeod, which was briefly this: In 1837, during the Canadian rebellion, a British armed force crossed the Niagara river, came within the limits of the state of New York, forcibly entered and captured the steamer Caroline, then moored to the shore, within the United States, and, while so doing, killed a man by the name of Durfree, who was on board of her. The British force then took the steamer from her moorings, carried her into the current of the river, set fire to her, and sent her in flames over the Falls of Niagara. Some years afterwards, a Canadian, by the name of McLeod, while in the state of New York, declared that he was one of the band that had thus captured and destroyed the Caroline. He was indicted in New York for the murder of Durfree. Thereupon the British government assumed the responsibility of the whole transaction, as done by their authority, which they insisted gave immunity to McLeod and his associates, and they demanded his immediate release. This demand was made, not upon the assertion that the act of entering our territory and capturing the Caroline was justifiable, but solely on the ground that the British government was alone responsible, and that a soldier acting under its orders could not be held liable. It is now known that, if the court in New York had convicted and punished McLeod, instant war would have been the consequence.

The other decisions particularly referred to in The Ostsee, in support of that dictum, are those known as the "Cape Nicola Mole Cases" (The Huldah, 3 C. Rob. Adm. 235, and The Driver, 5 C. Rob. Adm. 145), in which it appears that several French and Dutch ships were carried before the admiralty court in St. Domingo, and condemned as prize. But that court was not a prize court, and had no jurisdiction. Subsequently the claimants applied to the high court of admiralty for an order upon the captors to proceed to adjudication, which was granted. At the hearing, the only ground of defence was a condemnation by the admiralty court in St. Domingo, and it was insisted that the captors had reason to suppose that it had jurisdiction, because instructions from the government had been addressed to it as a prize court. But Sir William Scott held that the proceedings before that tribunal were mere nullities. It is to be observed that there was no evidence whatever that there was probable cause, or even the slightest ground, for the original capture. The whole scope of the decision was, that a proceeding, which took place after the vessel had been carried in, and which was a mere legal nullity, could afford no protection to the captor against his liability for an original capture and sending in, for which there did not appear to be any ground whatever; and that this was so, although some act of the government may have led the captor to believe that the court at St. Domingo had jurisdiction.

I have dwelt upon these authorities at some length, because they have been earnestly pressed upon the court, and are supposed to be the strongest in favor of the claimants. That they fall short of sustaining the claim now before me is manifest. Not one of them goes the length of holding that the captor can be liable in a case where, upon a true con-

struction of the law, the vessel herself presents probable cause, even although the vessel may have been involuntarily led into the predicament in which she is found.

There are certain cases cited for the captors, and still more favorable to them, which should not be overlooked.

In Le Louis, 2 Dod. 210, it appeared that a French ship, in the year 1816, while proceeding on a voyage to the coast of Africa for the purpose of obtaining a cargo of slaves, was attacked by an English armed cutter. A conflict ensued, in which lives were lost on both sides, but it ended in the capture of the vessel, and she was sent into Sierra Leone for adjudication. This was in time of peace. The cutter that captured her was fitted out under the authority of the colonial government, for the purpose of carrying into effect the British statutes for the suppression of the slave-trade. The cause was carried by appeal to the high court of admiralty. Sir William Scott decided that the slave-trade was not piracy by the law of nations; that a French ship was not subject to the British statutes respecting that trade, nor bound to submit to visitation and search in time of peace; and that the attack and capture were an aggression not authorized by any law; and yet he refused to allow the claimants either costs or damages against the captors.

In The San Juan Nepomuceno, 1 Hagg. Adm. 265, a Spanish slave-ship was in the year 1817, being a time of peace, forcibly taken by a British colonial armed ship, and carried into Sierra Leone. The cause was carried by appeal to the high court of admiralty in England. Sir William Scott affirmed his previous decision in Le Louis, and held that the Spanish ship was pursuing a voyage which to her was lawful, and that her arrest and detention were wrongful. At the first hearing, he refused to make an order of restitution against the captors, because the cargo, consisting of negroes, had been delivered over to the government; and he reserved the claim for costs and damages against the captors for further consideration. Subsequently counsel were heard on that question, and the claim was rejected.

In both these cases, the captured vessel was in no fault, and had presented no circumstance or appearance to mislead the captor; and his only excuse was, that he had acted under a mistake of the law, to which government officials had greatly contributed. But he had had abundant opportunity to examine the law for himself.

The Luna, Edw. Adm. 190, was an American vessel bound to St. Sebastian, and captured for an alleged breach of a paper blockade, which had been established by the orders in council of 1809. It was held that those orders did not embrace St. Sebastian. The vessel, therefore, upon a true construction of the orders issued by the sovereign of the captor, was not only in no fault, but

had given no color for the capture. Yet Sir William Scott not only refused to give costs or damages to the claimants, but, what is most extraordinary, compelled them to pay the expenses of the captor.

In U. S. v. Riddle, 5 Cranch [9 U. S.] 311, the supreme court of the United States held, that a doubt as to the law justified the seizure, and refused to award damages to the claimants, although the doubt was by no means a grave one. But there is another decision by the same high tribunal, which wears a different aspect,—The Charming Betsy, 2 Cranch [6 U. S.] 64. This vessel was seized on the ocean for an alleged violation of a statute of the United States. The supreme court held that the circumstances presented by the vessel did not constitute probable cause, and that the captor was liable in damages, although his orders were such as might well have led him to believe that there was probable cause. They further speak of him as the victim of a mistake, which he had committed. That decision is of the highest authority, and absolutely binding on this court, except so far as it may be modified by the subsequent decision of the U. S. v. Riddle, above referred to. But, taken in its utmost extent, it falls far short of sustaining the present claim. There, the vessel presented no reasonable cause for capture, and, in supposing that she did so, the captor made a mistake of the law. In the present case, the La Manche did present reasonable cause, and Captain Devens made no mistake of the law.

It thus appears, upon examination of the authorities, that there are numerous cases in which the captured vessel was in no fault, and had not, under a true construction of the law, presented even ground of suspicion, and yet the captor was exonerated because he acted under an honest mistake of the law. But not a single case has been found in which the captor has been held liable, when, upon a true construction of the law, the vessel herself presented reasonable cause for the capture; and such is the case of the La Manche.

I am thus brought to the conclusion that this claim for costs and damages against the captors cannot be sustained.

NOTE. After the decision in this case, from which no appeal was taken, the United States attorney, Mr. Dana, at the request of the owners of the vessel, and with the approval of Judge Sprague, represented the facts to the secretary of state; and on application by the owners, sustained by the French ambassador, the United States made to the owners a full and satisfactory compensation for their loss of time, &c., on the ground that the defect in the papers put on board at New Orleans, which led to, or contributed to, the capture and detention of the vessel, was the mistake of the military officers of the United States, who were acting as revenue officers at the time in that city.