22 U.S. 362 (1824)
9 Wheat. 362
The APOLLON, Edon, Claimant.
Supreme Court of United States.
March 13, 1824.
March 17, 1824.
*363 THE cause was argued by the Attorney-General,[a] for the respondent, and by Mr. Harper and Mr. Clay,[b] for the appellant.
Mr. Justice STORY delivered the opinion of the Court.
This is a libel, brought by the master of the French ship Apollon, against the Collector of the District of St. Mary's, for damages occasioned by an asserted illegal seizure of the ship and cargo, by the respondent, while she was lying in Belle river, a branch of the St Mary's, within the acknowledged territories of the King of Spain.
There is no dispute as to the national character of the ship. It appears that she sailed from France, bound to Charleston, in South Carolina; but as apprehensions were then entertained, that the proposed tonnage duty on French vessels might be passed by Congress, an alternative destination was given to her for a Spanish port, the object of the voyage being to land her cargo in the United States, and to take a return cargo of cotton to France. The cargo was partly owned by French subjects, and partly by a Mr. Le Maitre, a domiciled *364 merchant at Charleston, who was also the consignee. Upon her arrival off the port of Charleston, the master ascertained, that the French tonnage duty act had passed, (act of 15th of May, 1820, ch. 125.) and, therefore, declined entering the port. He had on board some specie belonging to the Bank of the United States, which, by the permission of the collector, was brought on shore by the revenue cutter. Having obtained information from the collector, that Amelia Island was not deemed an American territory, he sailed for that place, under the direction of the consignee; and there the ship lay for a considerable time, while the master proceeded to St. Augustine, a distance of about eighty miles, where he entered his ship and cargo, and paid the regular duties required by the Spanish authorities. While at this port, he ascertained, that the local authorities had it in contemplation to establish a new port of entry, to be called St. Joseph's, on Belle river, within the Spanish territory, and to appoint officers of the customs to reside there. The unquestionable object of this establishment, as disclosed in some correspondence between the immediate agents, which is inserted in the transcript, was to have a convenient depot, for the purpose of carrying on an illicit trade, in fraud of the revenue and navigation laws of the United States. Indeed, it is manifest, that there could be no other object, for there was no commercial population in the neighbourhood whose wants were to be supplied in the regular course of commerce. Of this object, perhaps, Captain Edon was not ignorant; but he *365 does not appear to have participated in any of the schemes connected with it. His own avowed object was, to transship his cargo into the United States, and to receive from thence a cargo of cotton, without subjecting himself to the payment of the French tonnage duty. Part of the cargo was sold at St. Augustine, probably to pay duties and charges; and upon Captain Edon's return to Amelia Island, under the advice and instructions of the Spanish officers of the customs, he removed his vessel from Amelia Island up Belle river, about six or eight miles; and after having lain at anchor near St. Joseph's for eighteen days, the ship with her cargo was there seized by the collector of St. Mary's, and carried to the latter port for adjudication. Admiralty proceedings were instituted by the attorney for the United States, in the District Court of Georgia, to subject the ship to the payment of the tonnage duty, and the cargo to forfeiture; but upon the hearing of the cause, the Court awarded a decree of restitution of the ship and cargo. From this decree the Government interposed an appeal, but the appeal was finally abandoned before any hearing in the appellate Court. In the mean time the present libel for damages was instituted, and some difficulty arose as to the propriety of entertaining it during the pendency of the other suit, because in that suit it was competent for the Court to award damages, if the seizure was without reasonable cause. The objection was well founded; but it was withdrawn, from the anxious desire of the Government to have the cause speedily adjudged in the proper tribunal, upon *366 the substantial merits. Upon the hearing of this cause, the District Court pronounced a decree for damages, from which an appeal was taken to the Circuit Court; and from the decree of the Circuit Court, confirming the decree of the District Court, with an addition of thirty-three and a third per cent. to all demurrage allowed by the latter, the present appeal was taken, and the cause now stands for a final decision.
The questions arising upon the record, have been argued with great zeal and ability, and embrace some considerations, which belong more properly to another department of the government. It cannot, however, escape observation, that this Court has a plain path of duty marked out for it, and that is, to administer the law as it finds it. We cannot enter into political considerations, on points of national policy, or the authority of the government to defend its own rights against the frauds meditated by foreigners against our revenue system, through the instrumentality and protection of a foreign sovereignty. Whatever may be the rights of the government, upon principles of the law of nations, to redress wrongs of this nature, and whatever the powers of Congress to pass suitable laws to cure any defects in the present system, our duty lies in a more narrow compass; and we must administer the laws as they exist, without straining them to reach public mischiefs, which they were never designed to remedy. It may be fit and proper for the government, in the exercise of the high discretion confided to the executive, for great public purposes, *367 to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws. Such measures are properly matters of state, and if the responsibility is taken, under justifiable circumstances, the Legislature will doubtless apply a proper indemnity. But this Court can only look to the questions, whether the laws have been violated; and if they were, justice demands, that the injured party should receive a suitable redress.
The first question is, whether there was a justifiable cause of seizure. This question has been already decided in the proceedings in rem, and the decree of acquittal, not having been appealed from with effect, is conclusive evidence in every inquiry before every other tribunal, that there was no such cause. This point was decided upon great consideration, in the case of Gelston v. Hoyt, (3 Wheat. Rep. 246.) and is not believed to be susceptible of any legal doubt. In the present case, however, as the parties have been induced to waive objections to this libel, for damages pending the former suit, upon the supposition, that the same questions might be as open here as there, it may not be amiss to examine the ground upon which the right of seizure is now attempted to be maintained. As to any forfeiture, or supposed forfeiture, under the act of 1820, ch. 125. it is very clear, that it cannot be maintained. That act simply authorizes a tonnage duty of eighteen dollars per ton, to be collected on all French ships, which shall be entered in the United States, *368 and provides for the collection of the duty, in the same manner as tonnage duties are to be collected by the collection act of 1799, ch. 128.; but this act inflicts no forfeiture for the non-payment of the tonnage duty, nor did the libel in rem even affect to proceed for any such forfeiture. The consideration of this act may then be at once dismissed. But the 29th section of the collection act of 1799, is supposed to contain a direct authority for the seizure. That section provides, "that if any ship or vessel, which shall have arrived within the limits of any district of the United States, from any foreign port or place, shall depart, or attempt to depart from the same, unless to proceed on her way to some interior district, to which she may be bound, before report or entry shall have been made by the master, &c. with the collector of some district of the United States, the master, &c. shall forfeit and pay the sum of 400 dollars; and it shall be lawful for any collector, &c. to arrest and bring back, or cause to be arrested and brought back, such ship or vessel, to such port of the United States, to which it may be most conveniently done." It is observable, that no forfeiture is here inflicted upon the vessel or cargo; but the penalty is personal upon the master. There was no pretence, then, to institute proceedings in the District Court, in rem, for the forfeiture, and the delay occasioned by such proceedings was clearly unjustifiable; in fact, the giroinal libel did not proceed for any forfeiture, except against the cargo. But it is said, that the arrest and bringing into port was justifiable, because *369 the ship had entered the district of St. Mary's, and had departed therefrom, without making any report or entry. The district of St. Mary's, by law, comprehends "all the waters, shores, harbours, rivers, creeks, bays, and inlets, from the south point of Jekyl Island, exclusive, to St. Mary's river, inclusive." St. Mary's river formed, at this period, the boundary between the United States and the Spanish territory, the boundary line, by the treaty of 1795, running through the middle thereof, in its whole course to the Atlantic ocean. The only access from the ocean to the Spanish waters running into the St. Mary's, as well as to the adjacent Spanish territories, was through this river. So that, upon the general principles of the law of nations, the waters of the whole river must be considered as common to both nations, for all purposes of navigation, as a common highway, necessary for the advantageous use of its own territorial rights and possessions. There is no doubt, that the Apollon did not enter the St. Mary's for the purpose of going into any American port, for trade or intercourse. Her avowed destination was for the Spanish waters and Spanish territories; and she never anchored in the St. Mary's, except upon the Spanish side of the river. Her proceeding up Belle river, was still more decisive of this intention. Under such circumstances, the question arises, whether a mere transit through the waters of the St. Mary's, for the purpose of proceeding to the Spanish territory, is to be deemed an arrival within the limits of the United States from a foreign port, within the sense of the 29th section *370 of the act already referred to. We are decidedly of opinion, that it cannot be so considered. The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction. And, however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the Legislature have authority and jurisdiction. In the present case, Spain had an equal authority with the United States over the river St. Mary's. The attempt to compel an entry of vessels, destined through those waters to Spanish territories, would be an usurpation of exclusive jurisdiction over all the navigation of the river. If our government had a right to compel the entry at our custom house, of a French ship, in her transit, the same right existed to compel the entry of a Spanish ship. Such a pretension was never asserted; and it would be an unjust interpretation of our laws, to give them a meaning so much at variance with the independence and sovereignty of foreign nations. The true exposition of the 29th section is, that it means to compel an entry of all vessels coming into our waters, being bound to our ports; and the very exception of vessels bound to some interior district, demonstrates the sense of the Legislature, by indicating the entire stress laid upon the destination of the vessel. But, even supposing, for a moment, that our laws had required an entry of the Apollon, in her transit, does it follows *371 that the power to arrest her was meant to be given, after she had passed into the exclusive territory of a foreign nation? We think not. It would be monstrous to suppose that our revenue officers were authorized to enter into foreign ports and territories, for the purpose of seizing vessels which had offended against our laws. It cannot be presumed that Congress would voluntarily justify such a clear violation of the laws of nations. The arrest of the offending vessel must, therefore, be restrained to places where our jurisdiction is complete, to our own waters, or to the ocean, the common highway of all nations. It is said, that there is a revenue jurisdiction, which is distinct from the ordinary maritime jurisdiction over waters within the range of a common shot from our shores. And the provisions in the collection act of 1799, which authorize a visitation of vessels within four leagues of our coasts, are referred to in proof of the assertion. But where is that right of visitation to be exercised? In a foreign territory, in the exclusive jurisdiction of another sovereign? Certainly not; for the very terms of the act confine it to the ocean, where all nations have a common right, and exercise a common sovereignty. And over what vessels is this right of visitation to be exercised? By the very words of the act, over our own vessels, and over foreign vessels bound to our ports, and over no others. To have gone beyond this, would have been an usurpation of exclusive sovereignty on the ocean, and an exercise of an universal right of search, a right which has never yet been acknowledged by *372 other nations, and would be resisted by none with more pertinacity than by the American. Assuming, then, the distinction to be founded in law, it is inapplicable to a case where the visitation and arrest have been in a foreign territory. It appears to us, then, that the Apollon was not bound to make entry at our custom house; and that the arrest was, under the circumstances, wholly without justification under our laws.
The next question, which has been argued at the bar, is, whether there was, in this case, probable cause of seizure. The most that can, with correctness, be argued on this point, is, that there was probable cause to arrest the vessel, under the 29th section of the collection act; but neither that section, nor any other law, authorized a seizure as for a forfeiture in this case, much less a prosecution in rem, to enforce a forfeiture; and so indeed the original libel in rem considered the case. But before adverting to the facts urged in support of the suggestion of probable cause, it may not be improper to consider, how far the existence of probable cause can be inquired into, or constitutes matter of defence in a suit like the present. Some obscurity arose at the argument, from not distinguishing between the effect of probable cause in cases of capture jure belli, and the effect in cases of municipal seizures. In respect to the former, no principle is better settled in the law of prize, than the rule that probable cause will not merely excuse, but even, in some cases, justify a capture. If there be probable cause, the captors are entitled, as of right, to an exemption from damages; and if *373 the case be of strong and vehement suspicion, or requires further proof to entitle the claimant to restitution, the law of prize proceeds yet farther, and gives the captors their costs and expenses in proceeding to adjudication. But the case is far different in respect to municipal seizures. Probable cause has never been supposed to excuse any seizure, except where some statute creates and defines the exemption from damages. The party who seizes seizes at his peril; if condemnation follows, he is justified; if an acquittal, then he must refund in damages for the marine tort, unless he can shelter himself behind the protection of some statute. The very act under which the present seizure is sought to be justified, contains an express provision on the subject, and shows the clear opinion of the Legislature. It declares, in the 89th section, "that when any prosecution shall be commenced, on account of the seizure of any ship or vessel, goods, &c., and judgment shall be given for the claimant, &c., if it shall appear to the Court, before whom such prosecution shall be tried, that there was a reasonable cause of seizure, the said Court shall cause a proper certificate, or entry, to be made thereof; and in such case, the claimant, &c. shall not be entitled to costs, nor shall the person who made the seizure, or the prosecutor, be liable to action, suit, or judgment, on account of such seizure or prosecution." By a subsequent act, (act of the 24th of February, 1807, ch. 74.) the like provision is extended to all seizures "under any act of Congress authorizing such seizures." It is apparent, from *374 the very language of this clause, that unless the certificate be obtained in the manner prescribed by the law, the seizing officer is liable to a suit for damages. And it was adjudged by this Court, in the case of Gelston v. Hoyt, (3 Wheat. Rep. 246.) that the denial of such certificate was conclusive evidence that there was no probable cause of seizure. No certificate was given upon the original libel instituted against the Apollon and cargo, and restitution having been decreed without it, it follows, of course, that probable cause can, in point of law, form no excuse against damages in this case. It is true, that if vindictive damages were sought, the circumstances of suspicion might properly go in mitigation; but where, as in the present case, compensation only is sought, the inquiry into the existence of such probable cause, can have no legal operation upon the merits of the controversy.
But how stands the fact as to the existence of probable cause? It has been very justly observed at the bar, that the Court is bound to take notice of public facts and geographical positions; and that this remote part of the country has been infested, at different periods, by smugglers, is matter of general notoriety, and may be gathered from the public documents of the government. But the question, whether the Apollon designed to engage in this unlawful traffic, must be decided by the evidence in this record, and not by mere general suspicions drawn from other sources. It is somewhat remarkable, that no act or attempt of smuggling is charged upon her by any testimony *375 in the record. Her avowed intention was, to send her cargo into the United States: but in what manner? It was perfectly lawful to transship the cargo, in American or other foreign vessels, to our ports; no law was violated thereby, and no evasion of the French tonnage duty accomplished; for the expense of the transshipment must have been supposed by Congress to be, in ordinary cases, a full equivalent to the increased duty. It has been very justly observed at the bar, that the act of Congress was not intended to operate as a non-intercourse or non-importation law, but merely as an additional and onerous tax upon French navigation, in retaliation of the restrictions of France upon our navigation. The policy of the act was, therefore, as completely effected by compelling French ships to perform circuitous voyages, and thus to incur the disadvantages of transshipments, as by payment of the tonnage duty. Now, it is principally from the declarations and admissions of Capt. Edon himself, that the designs of his voyage are known; and if we take part of his testimony, we ought in fairness to call in aid every explanation that he gives on the subject. He utterly disclaims any intention of fraud; and his declarations on this point have not been discredited. But, admit that he had an intention of illegal trade, how could that intention, not carried into effect within our jurisdiction, afford probable cause of seizure in a foreign territory? It was not matter of doubt, that Belle river was within the limits of Florida; and how can there be probable cause of seizure under our laws, when *376 the vessel is in a place exempt from our jurisdiction?
It is unnecessary to pursue this subject farther, as, in point of law, probable cause, if it existed, would not, under the circumstances of this case, constitute a valid defence. The remaining question is, as to the damages. The District Court allowed the following items of damage: 1 Demurrage of the ship for 175 days, at 30 dollars per day. This item, upon the appeal, was enhanced by the Court, as has been already stated, to 40 dollars per day. 2. The difference between the amount of the sales of the cargo (which was sold under a perishable monition,) being 3523 dollars and 10 cents, with ten per cent. thereon; and the nett proceeds of the sales, which had been restored to the claimants, that difference being 1215 dollars and 99 cents, together with six per cent. interest thereon. 3. The allowance of 250 dollars to the libellant, for travelling expenses to Washington. 4. The allowance to the second captain of 100 dollars, for his travelling expenses to Savannah, on the business of the ship. 5. The allowance of 500 dollars, as necessary counsel fees.
The principal arguments against this decree, have been directed to the allowance of demurrage, as a just measure of compensation. The Attorney-General contends, that it ought to be disallowed, as far too high a compensation; the Counsel for the libellant, as an allowance unreasonably low. This Court, on various occasions, has expressed its decided opinion, that the probable profits of a voyage, either upon the ship or cargo, cannot furnish *377 any just basis for the computation of damages in cases of marine tort. The basis has accordingly been, in every instance, rejected. Where the vessel and cargo are lost or destroyed, the just measure has been deemed to be their actual value, together with interest upon the amount, from the time of the trespass. Where there has been a partial injury only, that loss being ascertained, a similar rule has been applied. Where the property has been restored after detention, demurrage during the period has been generally allowed for the vessel, and interest upon the value of the cargo. Where the vessel and cargo have been sold, the gross amount of the sales, together with interest, has been adopted, as a fair recompense, and the addition of ten per cent. has been sometimes made, where the property was sold under disadvantageous circumstances, or had not arrived at the country of its destination. Such, it is believed, have been the rules most generally adopted in practice, in cases which did not call for aggravated or vindictive damages. And it may be truly said, that if these rules do not furnish a complete indemnification in all cases, they have so much certainty in their application, and such a tendency to suppress expensive litigation, that they are entitled to some commendation, upon principles of public policy.
But it is now said, that demurrage always arises ex contractu, and, therefore, cannot furnish any rule of compensation in cases of tort. The practice in Courts of Admiralty, has certainly been otherwise; and the very cases cited at the bar *378 show that no distinction has been taken, as to its application, between cases of contract and cases of tort. In truth, demurrage is merely an allowance or compensation for the delay or detention of a vessel. It is often a matter of contract, but not necessarily so. The very circumstance that, in ordinary commercial voyages, a particular sum is deemed by the parties a fair compensation for delays, is the very reason why it is, and ought to be, adopted as a measure of compensation, in cases ex delicto. What fairer rule can be adopted, than that which founds itself upon mercantile usage as to indemnity, and fixes a recompense upon the deliberate consideration of all the circumstances attending the usual earnings and expenditures in common voyages? It appears to us, that an allowance, by way of demurrage, is the true measure of damages in all cases of mere detention, for that allowance has reference to the ship's expenses, wear and tare, and common employment. Every other mode of adjusting compensation, would be merely speculative, and liable to the greatest uncertainties. In respect to the quantity of the allowance in the present case, there is a diversity of evidence on the record. Two of the witnesses examined upon the appeal, speak of 30 dollars, and one of 40 dollars, as a reasonable demurrage. The Circuit Court, upon this new testimony, allowed the latter; and as it is perfectly clear, that every Judge, in his own circuit, must have better means of weighing the testimony of credible witnesses, from a more exact acquaintance with their experience and extent of business, than we can *379 possibly derive from the bare inspection of the records; and as we perceive no reason to be dissatisfied with his judgment, we think that the decree, on this point, ought to be confirmed.
The second item is perfectly correct, except as to the allowance of the ten per cent. The cargo was sold at the market, though not at the port, of its destination; and from the appraisement, it appears to have sold for a higher price than it was valued at. The ground of the allowance of the ten per cent. then fails, for that is given for supposed losses upon a forced sale, or a falling market.
The third item, though small, does not appear to us proper to be allowed upon principle. It was no necessary expense in the prosecution of the suit, and, as it has been objected to, it must be struck out. The fourth item is not open to the same objection, and, therefore, may well stand.
The fifth item, allowing 500 dollars as counsel fees, is, in our opinion, unexceptionable. It is the common course of the Admiralty, to allow expenses of this nature, either in the shape of damages, or as part of the costs. The practice is very familiar on the prize side of the Court; it is not less the law of the Court in instance causes, it resting in sound discretion to allow or refuse the claim.
Upon the whole, the decree of the Circuit Court is to be reformed in these not very important particulars; in all other respects it is affirmed, and interest is to be allowed, at the rate of six per cent., upon the amount of the decree thus reformed, *380 from the time of the appeal from the Circuit Court, until it shall be carried into effect in the same Court, pursuant to the mandate of this Court.
DECREE.
This cause came on to be heard, &c. On consideration whereof, it is ORDERED and DECREED by the Court, that the decree of the Circuit Court, awarding the sum of 8695 dollars and 37 cents, damages, to the libellant, with his costs of suit, be in part reversed, to wit, for the sum of 602 dollars and 31 cents, and be affirmed in all other respects; and that the libellant do recover of the respondent, the said amount of damages decreed in the said Circuit Court, deducting the said sum of 602 dollars and 31 cents, to wit, the sum of 8093 dollars and 6 cents, together with interest, at the rate of six per cent. per annum, on the same sum, from the date of the decree in the Circuit Court, to the period of carrying this decree into effect in the Circuit Court, pursuant to the mandate of this Court.

 Decree in Circuit Court, $ 8695 37
 Deduct 10 per cent. on sales
 of cargo, $ 352 31
 Allowance for Washington
 journey, 250 00
 ______
 $ 602 31 602 31
 _______
 $ 8093 6

NOTES
[a] He cited Church v. Hubbart, 2 Cranch, 187. 234. Locke v. U.S., 7 Cranch, 339. 1 Mass. Rep. 27. 1 Gall. Rep. 111. 315. 5 Cranch, 311.
[b] They cited 2 Cranch, 122. 3 Cranch, 490. 3 Dall. 335. 3 Rob. 208. 5 Rob. 43. 4 Rob. 72. 1 Gall. Rep. 427. 3 Wheat. Rep. 559. 3 Dall. 133. 1 Rob. 241.