**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Francisco Da Silva RODRIGUEZ et al.,**
**Defendants.**

**No. 28854.**

United States District Court
S. D. California, S. D.
March 29, 1960.

Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., George W. Kell, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

Verne O. Warner, William Bruner, San Diego, Cal., for defendants.

JAMES M. CARTER, District Judge.

The present case raises this question: May aliens, found within the United States, be prosecuted here for the commission of crimes allegedly committed outside the territorial limits of the United States, when the crimes charged

concern the use of false statements to secure the documents necessary for admission into the United States?

The issue is raised on the motion of six defendants (Rodriguez, Virrissimo, Rocha, Andrade, Manuel Da Luz and Jose Da Luz), all of whom are aliens, to dismiss certain counts of the indictment for lack of jurisdiction of the court to hear the action.

Count 1 of the indictment, which is not here in issue, sets forth the alleged factual situation surrounding this case. This count charges that the "immigrant" or "alien" defendants, who have made this motion, conspired with seven "citizen" defendants and six "brides" to secure unlawful admission to the United States, in violation of § 1325 U.S.C.A., Title 8. The "brides" are termed "unindicted co-conspirators" in the indictment, but have plead guilty to a prior indictment. It is alleged that a "bride" would enter into a sham marriage with one of the "aliens" in order to enable the alien, a native of Portugal, to apply for and obtain a non-quota immigrant visa to which he would not otherwise be entitled.

Of the counts challenged, counts 2, 5, 8, 11, 14 and 17 are generally identical except that each names a separate defendant. In addition, one defendant is charged with commission of offenses at the American Embassy, Panama, Republic of Panama; and another is charged with the commission of offenses at the American Embassy, San Jose, Costa Rica. The remainder of the defendants are charged with the offenses at Consular offices on foreign soil. Counts 3, 6, 9, 15 and 18 are likewise generally identical with the same exceptions. Counts 2 and 3 are set forth in the margin as examples.[1]

**1.**
"Count Two
"(U.S.C. Title 18, Sec. 1546—
False Statement in Immigration Application)
"On or about April 18, 1957, at the American Consulate, Tijuana, Baja California, Mexico, defendant Francisco Da Silva Rodrigues knowingly made under oath, before a consular officer of the United States of America, a false statement with respect to a material fact in an 'Application for Immigrant Visa and Alien Registration', an application, affidavit and document required by the immigration laws and regulations prescribed thereunder, in violation of Title 18, Section 1546, U.S.C., in that said defendant, a native of Portugal (a quota area, as defined and provided by section 1151 of Title 8 U.S.C., and the proclamations issued by the president thereunder), stated and represented that he was the husband and spouse of one Kathleen Walker, an American citizen, and beneficiary of her 'Petition by United States Citizen for Issuance of Immigrant Visa', granted by the Department of Justice on December 14, 1956 and numbered VP–16–I–10014, and in that said defendant further stated, represented and claimed to be a non-quota immigrant under section 101(a) (27) (A) of the Immigration and Nationality Act by reason of his said marital status and of the said 'Petition by United States Citizen for Issuance of Immigrant Visa'; whereas in truth and in fact, as said defendant then and there well knew, his marriage to the said American citizen was a sham, false and fraudulent marriage entered into by said persons without any intention of consummating said marriage or of living together as husband and wife, but was in fact entered into for the sole purpose and intent of enabling the said defendant to secure a non-quota immigrant visa at a time when said defendant was a quota immigrant by reason of his said nativity and as such was not entitled to claim or receive a non-quota visa.

"The said 'Petition by United States Citizen for Issuance of Immigrant Visa,' a necessary part of defendant's false statement aforesaid, was executed by the said Kathleen Walker as agent for defendant on or about November 26, 1956 in the County of San Diego, State of California, within the Southern Division of the Southern District of California, and its said execution was procured and induced by defendant at or about the time of its said execution.

"Said defendant may now be found, and is residing within, the County of San Diego, State of California, within the Southern Division of the Southern District of California.
"Count Three
"(U.S.C. Title 18, Sec. 1546—Obtaining Immigrant Visa Based on False Claim)
"On or about April 18, 1957 at the American Consulate, Tijuana, Baja California, Mexico defendant Francisco Da

The counts are based on Title 18 U.S.C.A. § 1546.[2] The count 2 series charges the making of a false statement in an immigration application, based on the last charging paragraph of § 1546; the count 3 series charges the obtaining of an immigration visa by a false claim, based on the first paragraph of § 1546.

It is apparent, then, that all counts challenged by the defendants have in common the allegations that the defendant, an alien, committed an offense against the laws of the United States while outside the territorial jurisdiction of this court and while physically present in an American Embassy or Consular office of the United States on foreign soil. The "false statement" counts differ from the "obtaining visa based on false claim" counts in that the false statement counts allege that previous to the execution of the false statement by the immigrant defendant, he had procured, through the agency of his bride, the filing of a "Petition by United States Citizen for Issuance of Immigrant Visa" in the United States, and that this petition formed a necessary part of the immigrant defendant's false statement.

### Contentions

Essentially it is the contention of the defendants that the offense charged in the indictment is outside the jurisdiction of this court; indeed, that it is outside the jurisdiction of any court of the United States. The basis for this assertion is the concept that the criminal jurisdiction of any government is limited to acts committed within the territorial bounds of that nation. The government, on the other hand, denies that the territorial theory is presently applicable, concluding that the court should apply a so-called "protective theory" of jurisdiction. It is asserted that in certain cases in which the laws of the United States are violated, and the crime constitutes an offense directed at the government in its capacity as sovereign, the government has the power to punish those who have broken its laws, should those persons later be found in the United States.

Silva Rodrigues obtained, received and accepted an immigrant visa, required for his entry into the United States, knowing the same to have been procured by means of false claims and statements and by fraud, which said claims and statements were, namely, that said defendant was the husband of a citizen of the United States; that he was beneficiary of a 'Petition by United States Citizen for Issuance of Immigrant Visa' numbered VP–16–I–10014; that based thereon said defendant was entitle to claim, and claimed, to be a non-quota immigrant; and the same was false and fraudulent, as defendant then and there well knew, in that the said marriage to the said United States citizen was a false and fraudulent relationship which had been entered into by and between the defendant and his alleged wife, one Kathleen Walker for the sole purpose of enabling said defendant to claim the said non-immigrant status at a time when the defendant, a native of Portugal, was a quota immigrant, and as such was not entitled to enter, be or remain in the United States under the said non-quota immigrant status in violation of Title 18, Section 1546, U.S.C.

"Said defendant may now be found, and is residing within, the County of San Diego, State of California, within the Southern Division of the Southern District of California."

2. "§ 1546. Fraud and misuse of visas, permits, and other entry documents.

"Whoever, knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, or document, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or * * *

"Whoever knowingly makes under oath any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement—

"Shall be fined not more than $2,000 or imprisoned not more than five years, or both. As amended June 27, 1952, c. 477, Title IV, § 402(a), 66 Stat. 275."

Although these positions seem to be diametrically opposed, they are not. They are both, however, accurate statements of a segment of the law applicable to this sort of situation; and when the overall picture is developed, both will have validity within it own context. Before either of these contentions are considered, it will be necessary to determine the scope and application of the sections of Title 18, under which the defendants are charged.

*Scope of § 1546, Title 18 U.S.C.A.*

The pertinent parts of § 1546, Title 18 U.S.C.A. must be construed to determine if Congress has attempted to define a crime, or crimes, involving acts committed beyond the territorial jurisdiction of the United States. If this has not been done, our inquiry is at an end and the motion to dismiss must be granted. Section 1546, Title 18 U.S.C.A., is the last section of Chapter 75, entitled "Passports and Visas." All the prior sections in Chapter 75 deal with the various crimes committed in connection with the possession and use of passports. Most of these sections contain prohibitions against acts which could, in all probability, be commited only outside the United States. Section 1541 in part prohibits a consular officer from knowingly and wilfully verifying a passport for a person not owing allegiance to the United States. Section 1542 in part prohibits the wilful and knowing use or attemped use of a passport secured by any false statement. Section 1543 in part prohibits use or attempted use of a false, forged, counterfeited, mutilated or altered passport. Section 1544 in part prohibits the use or attempted use of a passport issued to another, or the use or attempted use of a passport in violation of the conditions and restrictions contained therein.

In § 1546 Congress has sought to embody all similar abuses which would relate to the use of visas or other documents pertaining to entry into the United States.[3]

The difference between a passport and a visa was certainly known to the framers of these sections. A passport is given by a government to one of its citizens as evidence of that government's permission for the holder to travel. United States ex rel. Calamia v. Redfern, C.C.D.La.1910, 180 F. 506, 508. The document is addressed to the governments of those lands through which the holder may pass, and requests that these foreign governments grant the holder permission to travel through their lands, giving him all lawful protection while in the foreign state. It also directs that the foreign diplomatic and consular offices of the issuing country provide their good auspices while the bearer is abroad. Communist Party of United States v. Subversive Activities Control Board, 1954, 96 U.S.App.D.C. 66, 223 F. 2d 531, 555.

A visa, on the other hand, is a recognition of the validity of a passport and an affirmative response to the implied requests mentioned above, issued by the government of the country in which the holder of the passport desires to travel. See, United States ex rel. Johanson v. Phelps, D.C.D.Vt.1926, 14 F.2d 679, 681.

Turning again to the phraseology used in § 1546 itself, it appears that the crimes indicated by the following words in the first paragraph—" * * * forges, counterfeits, alters * * * falsely makes * * * "—are all acts which could be committed either within or without the territorial limits of the United States. The same is true of the words "utters"

---

**3.** Section 1546, Title 18 U.S.C.A., was amended in 1952 to include, after the words "visa or permit" contained in the first paragraph, the words " * * * or other document required for entry into the United States," June 27, 1952, c. 477, Title IV, Sec. 402(a), 66 Stat. 275. The last paragraph was also amended to include the knowing presentation of a document containing a wilfully false statement. These technical changes in the wording of the section serve to broaden the number of documents covered by the law, and in no way diminish or alter the basic application of the section.

or "possesses", both of which are included in that same paragraph.

However, in light of the purpose of a visa as discussed above, the words "uses" and "attempts to use" plainly refer to acts which would be committed prior to or upon entry into the United States. The same is equally true of the phrase " * * * obtains, accepts or receives * * *." While it is conceivable that a situation would arise in which these acts could be committed within the United States, it seems clear that the statute was not directed solely at the act of passing a visa from one person to another after the document had been used to secure entry into the United States.

The last paragraph of § 1546 provides that "whoever" knowingly makes any false statement under oath in "any application, affidavit, or other document required by the immigration laws * * ", or who knowingly presents such a document shall be guilty of an offense. The making of a statement to be used in a visa application will normally take place outside the territorial limits of the United States; and the presentment of a document containing a false statement will almost invariably take place outside the United States as the alien presents his papers for approval by a government consular or embassy officer.

 We have considered such cases as American Banana Co. v. United Fruit Co., 1908, 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826, holding that all legislation is prima facie territorial, and have concluded that any such inference has been overcome by a reading of this statute.[4] We conclude that the intent of § 1546 is to provide criminal punishment for those who, through fraud or other means committed within or without the boundaries of the United States, manage to provide themselves with, or use or attempt to use, unauthorized documents requisite to entrance into the United States.

 Additional support for this view is found in Part III, Chapter 12 of Title

8. Chapter 12 itself is entitled "Immigration and Nationality" while Part III, which is composed of three sections, 1201–1203, is entitled "Issuance of Entry Documents." Of these three sections, the first two set forth, in general terms, the steps to be taken by a consular officer during the procedure leading up to the issuance of a visa. The last section (1203) deals with reentry permits. A "consular official" customarily is a person residing in a foreign city. On him is placed the duty of supporting commercial intercourse and protecting the citizens of his government. Schunior v. Russell, 1892, 83 Tex. 83, at page 88, 18 S.W. 484, at page 485; also see Rocca v. Thompson, 1911, 223 U.S. 317, 32 S.Ct. 207, 56 L.Ed. 453. Hence, the words "consular officer" as used in these two sections, indicate that the issuance of a visa, and the transactions leading up to that act, are contemplated as taking place in a foreign land.

Section 1202, for example, provides that an alien shall make application for an immigrant visa and for alien registration. In subdivision (e) of the same section, the following appears:

> " * * * each copy of an application required by this section shall be signed by the applicant in the presence of the consular officer, and verified by the oath of the applicant administered by the consular officer * * *".

The very fact that the law requires that the alien take an oath to his application, made before a consular officer, is a further reason for holding that Congress intended to encompass acts of an alien, who, outside the United States, " * * * uses, attempts to use * * * obtains, accepts, or receives * * *" any visa or permit, knowing it to have been procured by means of any false claim or statement (first paragraph, § 1546); and for the alien who " * * * knowingly makes under oath any false statement with respect to a material fact

---

4. See United States v. Bowman, 1922, 260 U.S. 94, 98–100, 43 S.Ct. 39, 67 L.Ed. 149, for an excellent discussion of the interpretation of the jurisdictional bounds of a criminal statute, differentiating American Banana Co., supra.

in any application * * * required by the immigration laws * * * " (last charging paragraph, § 1546).

The significance of the oath requirement becomes clear on consideration of Title 22 U.S.C.A., which deals in general terms with the powers, duties and organization of the foreign service. Section 1203 of that Title makes general provision for dealing with those who may make false statements to a consular officer under oath. After providing that certain of the consular staff be empowered to take such statements as are required by their duties while in a foreign country, the statute further provides as follows:

"* * * Every such oath, affirmation, affidavit, deposition, and notarial act administered, sworn, affirmed, taken, had, or done, by or before any such officer * * * shall be as valid, and of like force and effect within the United States, to all intents and purposes, as if administered, sworn, affirmed, taken, had, or done, by or before any other person within the United States duly authorized and competent thereto. If any person shall willfully and corruptly commit perjury, or by any means procure any person to commit perjury in any such oath, affirmation, affidavit, or deposition,

within the intent and meaning of any Act of Congress now or hereafter made, such offender may be charged, proceeded against, tried, convicted, and dealt with in any district of the United States, in the same manner, in all respects, as if such offenses had been committed in the United States * * * and shall be subject to the same punishment and disability therefore as are or shall be prescribed by any such act for such offense * * * ".

There can be no doubt that the effect of this statute is to provide for extraterritorial jurisdiction, and to provide it in all statutes requiring an oath.

The validity of § 1203, Title 22 U.S.C.A., has been considered in several cases, but the courts have given scant attention to its constitutionality. A short discussion of the cases involving this statute is given, infra, after our discussion of the basic considerations here involved.

### The Constitutional Basis for Extraterritorial Jurisdiction

■■ Various provisions of the United States Constitution have been advanced in support of the validity of § 1546, Title 18 U.S.C.A., when that section is construed to have an extraterritorial effect.[5] We have rejected reliance on any

---

5. The count 2 series in the indictment has a paragraph, not found in the count 3 series, that might appear to avoid the constitutional issue. As an example, count 2 alleges that the offense of making a false statement before a consular officer occurred at Tijuana, Mexico, on April 18, 1957. It is then alleged that a "Petition by United States Citizen for Issuance of Immigration Visa," i. e. the petition of the "bride" made to secure the immigrant visa, was a "necessary part of defendant's false statement" made on *April 18, 1957*, and that this petition by the "bride" was made in San Diego, California on *November 26, 1956.* It is further alleged that its "execution was procured and induced by the defendant" on such date.

For two reasons we believe the constitutional issue as to the count 2 series of the indictment remains in the case. First, this act of the bride was committed at an earlier date, and thus the situation does not come within the cases where the act of the defendant, *after* its commission, had an effect or impact in the United States. Strassheim v. Daily, 1910, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735; United States v. Steinberg, 2 Cir., 1932, 62 F.2d 77; Hartzell v. United States, 8 Cir., 1934, 72 F.2d 569. Second, a defendant must be charged with reasonable certainty. Count 2 of the indictment, so construed, charges an offense in Mexico on April 18, 1957, and not the commission of an offense in the United States through the acts of an agent on November 26, 1956. To construe this count of the indictment as charging an offense on November 26, 1956, and another on April 18, 1957 would make the count duplicitous.

We treat the offense in count 2, therefore, as having been committed in Mexi-

of the constitutional provisions with the exception of Art. I, Sec. 8, Clause 10, which provides:

"The Congress shall have Power * * * To define and punish Piracies and Felonies committed on the high Seas and *Offences against the Law of Nations.*" [emphasis supplied];

and Art. III, Sec. 2, Clause 3, reading:

"The Trial of all Crimes * * * shall be held in the State where the said Crimes shall have been committed; but *when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.*" [Emphasis supplied.]

The other constitutional provisions advanced which we do not think pertinent are included in the footnote.[6]

Before consideration is given to the power of Congress to define and punish offenses against the law of nations, we propose to discuss the nature of criminal jurisdiction under international law. A Harvard research project, Research in International Law, considered various problems of international criminal jurisdiction, reporting its conclusions in 1935 (see Research on International law, Part II, Jurisdiction with Respect to Crime, 29 Am.J.Int'l L.Supp. 435 (1935)). The reporter for that portion of the project, Professor E. D. Dickinson, summarized their findings concerning five general principles of international jurisdiction:

"These five general principles are: first, the territorial principle, determining jurisdiction by reference to the place where the offence is committed; second, the nationality principle, determining jurisdiction by reference to the nationality or national character of the person committing the offence; third, the protective principle, determining jurisdiction by reference to the national interest injured by the offence; fourth, the universality principle, determining jurisdiction by reference to the custody of the person committing the offence; and fifth, the passive personality principle, determining jurisdiction by reference to the nationality or national character of the person injured by the offence. Of these five principles, the first is everywhere regarded as of primary importance and of fundamental character * * *. The third is claimed by most states, regarded with misgivings in a few, and generally ranked as the basis of an auxillary competence." Id. at 445.

We are concerned with the application of the first and third principles mentioned, the territorial and protective theories.

■ The territorial principle has often found expression in our case law.[7]

co on April 18, 1957, and conclude that the constitutional issue on the count 2 series is before the court in this case.

6. Article III, Sec. 2, Clause 1.
"Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; * * * to Controversies to which the United States shall be a Party; To Controversies * * * between a State; or the Citizens thereof, and foreign States, Citizens or Subjects."

Article I, Sec. 8, Clause 4.
"The Congress shall have Power * * To establish an uniform Rule of Naturalization * * *"

Article I, Sec. 8, Clause 18.
"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of United States, or in any Department or Officer thereof."

7. Church v. Hubbart, 1804, 2 Cranch 187, 234, 2 L.Ed. 249; The Apollon, 1824, 9 Wheat. 362, 370, 6 L.Ed. 111; Slater v. Mexican National R. Co., 1903, 194 U.S. 120, 126, 24 S.Ct. 581, 48 L.Ed. 900; American Banana Co. v. United Fruit Co., 1908, 213 U.S. 347, 355, 29 S.Ct. 511, 53 L.Ed. 826; United States v. Freeman, 1915, 239 U.S. 117, 120, 36 S.Ct. 32, 60 L.Ed. 172; United States v. Bowman, 1922, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149; Yenkichi Ito v. United States, 9 Cir., 1933, 64 F.2d 73,

One of the first broad statements of this theory was made in The Apollon, 1824, 9 Wheat. 362, 6 L.Ed. 111, where the court set forth the doctrine in these sweeping terms: "The laws of no nation can justly extend beyond its own territories, except so far as it regards its own citizens." Id., 9 Wheat. at page 370. This "general rule" is followed by a limitation, necessary to a proper interpretation of the territorial concept: "[The laws of a nation] can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction." Ibid. The basic philosophy behind the territorial theory is that a government, in order to maintain its essential sovereignty, must be the only power capable of effecting the maintenance of peace and order within its own boundaries. Therefore, no other nation can enact extraterritorial legislation which would interfere with the operation of such laws.

Despite the prevalence of the territorial concept of jurisdiction in our jurisprudence, studies of international law such as the Harvard project mentioned, supra, indicate that as a statement of the entire international law of jurisdiction, it is inadequate. As a statement of one general precept of the international law of jurisdiction, it becomes entirely adequate.

▪ ■ Unfortunately, this territorial theory has sometimes been considered to be an exclusive expression of the international law of jurisdiction. The simplicity of any such generalized theory is deceiving, since it fails to take into account the ever present factual complexities which are evidenced by a constantly growing body of exceptions to the rule. Nationals abroad are held to be subject to the laws of their government wherever they may be, Blackmer v. United States, 1931, 284 U.S. 421, 436, 437, 52 S.Ct. 252, 76 L.Ed. 375, and cases and authorities cited therein. But this is an application of the nationality theory, not an exception to territorial jurisdiction.

■ Acts committed outside the territorial limits of the State but intended to produce, or producing, effects within the boundaries of the State are subject to penal sanctions; Strassheim v. Daily, 1910, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735; Ford v. United States, 1926, 273 U.S. 593, 620, 621, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 443; Ramirez & Feraud Chili Co. v. Las Palmas Food Co., D.C.S.D.Cal. 1956, 146 F.Supp. 594, 600, affirmed 9 Cir., 245 F.2d 874. Where the effect is felt by private persons within the State, penal sanctions rest on the "objective," or "subjective," territorial principle used in the Strassheim case, supra. See 29 Am.J.Int'l L.Supp., at 484 et seq. Where the effect of the acts committed outside the United States is felt by the government, the protective theory affords the basis by which the state is empowered to punish all those offenses which impinge upon its sovereignty, wherever these actions take place and by whomever they may be committed.[8] The re-

75, certiorari denied 289 U.S. 762, 53 S.Ct. 796, 77 L.Ed. 1505; United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255.

8. The essence of the protective theory of jurisdiction was recognized as early as Church v. Hubbart, 1804, 2 Cranch 187, at pages 234–235, 2 L.Ed. 249, where the court stated:
"* * * The authority of a nation, within its own territory, is absolute and exclusive. * * * But its power to secure itself from injury may certainly be exercised beyond the limits of its territory * * *. Any attempt to violate the laws made to protect this right, is an injury to itself, which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same, at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to."

sults of such a theory, are, in many ways similar to those reached in the Strassheim case, supra, where the court directed its attention to the objective results of the criminal act and the location of its effect. Any act which would offend the sovereignty of a nation must, of necessity, have some effect within the territorial limits of that state or there would be no adverse effect upon the government justifying a penal sanction.

The protective principle was codified by the Harvard group in Article 7 of their report:

"A state has jurisdiction with respect to any crime committed outside its territory by an alien against the security, territorial integrity or political independence of that state, provided that the act or omission which constitutes the crime was not committed in exercise of a liberty guaranteed the alien by the law of the place where it was committed." 29 Am.J.Int'l L.Supp., at 543.[9]

It is clear that international law recognizes not only the territorial theory of jurisdiction, but also the protective principle and several others as well. Having these principles in mind, it is now necessary for us to consider their effect upon the potential exercise of jurisdiction by our constitutionally created government.

A state might seek to exercise its jurisdiction in two general localities: First, it can attempt to impose its laws upon those found within its boundaries, holding these persons, whoever they may be, liable for acts committed within or without the territorial limits of the State. Second, the state might seek to control the actions of those physically in some other sovereign nation. This distinction was clearly expressed in a case tried by the International Court. The S. S. Lotus, P.C.I.J., Ser. A, No. 10, II Hudson, World Court Reports 20:

"* * * the first and foremost restriction imposed by international law upon a state is that—failing the existence of a permissive rule to the contrary—*it may not exercise its power in any form in the territory of another state.* In this sense jurisdiction is certainly territorial; it cannot be exercised by a state outside its territory except by virtue of a permissive rule derived from international custom or from a convention.

"It does not, however, follow that international law prohibits a state from exercising jurisdiction in its own territory, in respects any case which relates to acts which have taken place abroad, and in which it cannot rely on some permissive rule of international law * * *. Far from laying down a general prohibition to the effect that states may not extend the application of their laws and the jurisdiction of their courts to persons, property and acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every state remains free to

---

9. James Brown Scott set out the codification of this same area made by the Institute of International Law, meeting in 1931 (James Brown Scott, "The Two Institutes of International Law," 26 Am. J.Int'l L. 87 at 89 (1932)):

"Art. 4. Every State has the right to punish acts committed outside its territory, even if committed by foreigners, when such acts constitute:

"(a) an attempt against the security of the State;

* * * * *

This rule is applicable even when the deeds in question are not provided for by the penal laws of the country in whose territory they have been committed."

In commenting upon the prevailing theory used to support jurisdiction in the Anglo-Saxon countries and comparing it to that employed by the Continental European countries, Mr. Scott concluded that neither is sufficient in and of itself, each borrowing from the other to meet the needs of the nation. This codification sought to bring the two together, adopting portions of each to secure a more comprehensive protection of the state and its citizens.

adopt the principles which it regards as best and most suitable. * * *

"In these circumstances, all that can be required of a state is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty * * *.

"Though it is true that in all systems of law the principle of the territorial character of criminal law is fundamental, it is equally true that all or nearly all these systems of law extend their action to offences comitted ouside the territory of the state which adopts them, and they do so in ways which vary from state to state. The territoriality of criminal law, therefore, is not an absolute principle of international law and by no means coincides with territorial sovereignty." [Emphasis supplied.] [10]

 There is no question as to the power of Congress to enact § 1546, Title 18 U.S.C.A., insofar as it applies only to acts committed within the United States. We have stated that the power of Congress to enact this section with its extraterritorial effect is found in Art. I, Sec. 8, Clause 10: "To define and punish * * * Offences against the Law of Nations." The powers of the government and the Congress in regard to *sovereignty* are broader than the powers possessed in relation to internal matters, United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255.

" * * * The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect to our internal affairs." Id., 299 U.S. at page 315, 57 S.Ct. at page 219.

"It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution." Id., 299 U.S. at page 318, 57 S.Ct. at page 220.

The court cites other Supreme Court cases on the power to acquire territory by discovery and occupation, to expel undesirable aliens, and to make such international agreements as do not constitute treaties, concluding that none of these powers are

" * * * expressly affirmed by the Constitution, [but] nevertheless exist as inherently inseparable from the conception of nationality. This

---

10. On the surface, the two theories herein discussed seem to conflict: the use of the protective theory to assert jurisdiction over an act committed outside the territorial limits of a state, but within the boundaries of another nation, might be an interference with the sovereignty of the nation in which the act is committed, a result barred by the territorial theory. However, the protective concept attempts to reach only those acts which are directed at the integrity of the other state and not those acts directed at the peace and quiet of the nation in which they are committed. The territorial theory applies to those acts which have an effect upon the internal peace of the nation in which they are committed.

This distinction was made in United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149, when the court upheld the application of the United States criminal laws to the actions of American nationals abroad. The same reasoning provided a basis for the decision in a case involving the right of Japan to try an American service man stationed there for acts committed outside the scope of his duties. Wilson v. Girard, 1954, 354 U.S. 524, at page 529, 77 S.Ct. 1409, at page 1411, 1 L.Ed.2d 1544.

The last portion of Art. 7 of the Harvard project's codification recognizes this apparent conflict and resolves it by limiting the protective jurisdiction of a nation to those acts which are not guaranteed as liberties by the country in which they are committed.

We do not decide the problems that might arise should the defendant already have been tried and punished for the same act by the country in which he committed the illegal act.

the court recognized, and in each of the cases cited found the warrant for its conclusions not in the provisions of the Constitution, but in the law of nations." Ibid.

 Entry by an alien into the United States secured by means of false statements or documents is an attack directly on the sovereignty of the United States. The effect of such an entry in connection with espionage or subversive activities clearly pinpoints the great impact such an entry could have on sovereignty.

To put it in more general terms, the concept of essential sovereignty of a free nation clearly requires the existence and recognition of an inherent power in the state to protect itself from destruction. This power exists in the United States government absent express provision in the Constitution, and arises from the very nature of the government which was created by the Constitution.

 Even the prohibitions in the First Amendment must yield to this inherent power. In American Communications Association, C. I. O. v. Douds, 1949, 339 U.S. 382, at page 394, 70 S.Ct. 674, at page 682, 94 L.Ed. 925, Chief Justice Vinson said:

"Although the First Amendment provides that Congress shall make no law abridging the freedom of speech, press or assembly, it has long been established that *those freedoms themselves are dependent upon the power of constitutional government to survive. If it is to survive it must have power to protect itself* against unlawful conduct and, under some circumstances, against incitements to commit unlawful acts. Freedom of speech thus does not comprehend the right to speak on any subject at any time." [Emphasis supplied.]

In Carlson v. Landon, 9 Cir., 1951, 187 F.2d 991, at page 997, affirmed 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547, Stephens, Circuit Judge said:

"The basic principles of our government that the individual shall be free to speak, free to publish, free to worship, free to be personally unrestrained, are not absolute. *It would be an anomalistic use of the term 'government' to apply it to a state organization which is without the power to resist its own violent destruction."* [Emphasis supplied.]

 Possessing this power of protection, Congress is entitled to utilize it to the full extent. From the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation. The mere fact that, in the past, Congress may not have seen fit to embody in legislation the full scope of its authorized powers is not a basis for now finding that those powers are lacking. Disuse, or even misuse of power inherent in the federal government, or given to it by the Constitution, is not a valid basis for us to hold that this power may not later be employed in a proper fashion.[11] Thus, having found that the protective principle exists as a recognized doctrine of international law, or the "Law of Nations," it becomes a principle that Congress can rightfully incorporate into its legislation without waiting for action to be taken by foreign governments which would grant the United States the right to exercise jurisdiction. Without the right to act in the same fashion, and to the same extent, as other sovereigns, the

11. Note the further comment of the Reporter to the Harvard Research Project concerning the existence of the protective principle in international law:
"* * * In view of the fact that an overwhelming majority of States have enacted such legislation, it is hardly possible to conclude that such legislation is necessarily in excess of competence as recognized by contemporary international law. The contention advanced by certain Anglo-American writers that jurisdiction over aliens is restricted to those within the territory and to pirates appears to be the result of a tendency to equate the exercise of jurisdiction undertaken in a particular State with competence as determined by international law." 29 Am.J.Int'l L.Supp. at 556.

United States government becomes something less than whole (United States v. Curtiss-Wright Export Corp., supra, 299 U.S. at page 318, 57 S.Ct. at page 220).

### The Prior Case Law

Turning now to a consideration of the prior cases which have involved statutes seeking to give the government extraterritorial jurisdiction over aliens for acts committed outside the United States, we find a scarcity of material involving the constitutionality of such legislation.[12]

Judge Yankwich gave exhaustive consideration to the predecessor of § 1203, Title 22 U.S.C.A. (set out in part, supra). He held that the statute was constitutional (United States v. Archer, D.C.S.D. Cal.1943, 51 F.Supp. 708) when applied to an alien who had made a false statement to a vice-consul at Guadalajara, Mexico, while applying for a non-immigrant visa. The decision was based on alternate theories. First, it was concluded that the consulate was United States territory and under control of our government.[13] Second, and more germane to our inquiry, Judge Yankwich found that the statement was an offense *" * * * not against the country where the consul is, but against the sovereignty*

*of the United States."* Id., at page 711.[14] He then went on to say: "[The alien's] Act being a fraud against the United States, deception practiced in order to secure a benefit—the Congress had the right to punish it as perjury." Ibid.

In a case decided some ten years prior to the Archer decision, supra, the Seventh Circuit held that a statement made under oath to an American consul abroad was a crime, under the predecessor of § 1203, sufficient to support deportation proceedings (United States ex rel. Majka v. Palmer, 7 Cir., 1933, 67 F.2d 146). The court refused to consider the possibility of whether or not the United States might have had the power to seek the extradition of the defendant from some foreign country for this offense, and went on to say (Id., at page 147):

"* * * it seems clear to us that when he did enter the United States, thereby making use of the fraudulent passport for the very purpose for which the crime was committed, he placed himself within the control of its laws and subjected himself to whatever proceedings it might see fit to bring as the result of his criminal act. *It therefore becomes immaterial to deter-*

12. The conspiracy cases involving unlawful entry of an alien into the United States are of no assistance to us, since they do not consider the extraterritorial effect or constitutionality of the statute. This is undoubtedly because part, if not all, of the acts involved occurred in the United States. See, Lutwak v. United States, 1952, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (conspiracy based on 8 U.S. C.A. (1946 Ed.) § 180a, now 8 U.S.C.A. § 1325, and 8 U.S.C.A. (1946 Ed.) § 220(c), now 18 U.S.C.A. § 1546) ; United States v. Rubenstein, 2 Cir., 1945, 151 F.2d 915, certiorari denied 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462 (conspiracy based on 8 U.S.C.A. (1946 Ed.) § 180a, now 8 U.S.C.A. § 1325). For the same reason we do not place reliance upon those cases involving use of the United States mails to defraud. See United States v. Steinberg, 2 Cir., 1932, 62 F.2d 77; Hartzell v. United States, 8 Cir., 1934, 72 F.2d 569.

13. It is doubtful that the United States would assert jurisdiction over the territory of a consulate in a foreign country. The accepted rule that the consulate and its staff is protected by immunity under International law and treaties, should be differentiated from the claim that all matters occurring within the consulate's bounds are subject to the laws of the United States. See II Hackworth, Digest of International Law, 623 (1941).

14. See also 2 Moore's International Law Digest 266 where the author reaches the same conclusion:
"As these acts [the oath by the alien] are performed under the laws of the United States, not only does the person who appears before a secretary of legation or a consular officer for any of the purposes enumerated in the act submit himself to the laws of the United States to that extent, but if he swears falsely— he violates a law to whose execution in its territory the foreign government has consented."

*mine whether or not perjury is held to be a crime in Poland, since the crime admitted was committed against the United States."* [Emphasis supplied.]

In reaching its conclusion that the deportation proceedings should be affirmed, it was necessary for the court to conclude that there had been a crime committed against the United States. The lack of prosecution and conviction for the crime was overcome by the fact that the alien admitted that he had committed the acts charged. Having concluded that the acts admitted constituted a crime, it follows that had the government brought criminal prosecution instead of deportation proceedings, and had the facts admitted been proven, the alien could have been punished for this violation of the law.

In United States v. Flores-Rodriguez, 2 Cir., 1956, 237 F.2d 405, the defendant alien had been convicted of a violation of § 1203, involving a false statement made to an American vice-consul in Havana, Cuba, concerning the defendant's lack of a criminal record. After concluding that the vice-consul had authority under the law to administer the oath, the court affirmed the conviction without comment on the jurisdictional question.

In Chin Bick Wah v. United States, 9 Cir., 1957, 245 F.2d 274, certiorari denied 355 U.S. 870, 78 S.Ct. 120, 2 L.Ed.2d 76, the Ninth Circuit affirmed the conviction of a Chinese alien for making a false statement under oath to the American vice-consul at Hong Kong. The alien was charged and convicted of conspiracy to violate the immigration laws as well as under a substantive count based on § 1546, Title 18 U.S.C.A., the latter count apparently identical in nature with that presently before us. Although the court carefully considered the factual basis of the conviction, it did not discuss, or even

mention, any possible constitutional objections to the validity of this section.[15]

■ United States v. Baker, D.C.S.D. N.Y.1955, 136 F.Supp. 546, considered the validity of a conviction of an alien for violation of 18 U.S.C.A. § 1001, falsification of a material fact within the jurisdiction of " * * * any department or agency of the United States * * *," in this case, the Immigration and Naturalization Service. The court specifically stated that the posture of the question before it required a decision as to whether or not the United States had the power to try an alien for a crime committed abroad. The court then answered this question in the negative. We cannot agree.

There are several reasons for our disagreement. First, the Baker case apparently did not consider the protective theory of jurisdiction, or at least did not find it applicable, nor did it mention the conclusions of Judge Yankwich in the prior Archer case, supra. Second, the court disposed of the Palmer case, supra, on the grounds that a deportation proceeding is far different from a trial (United States v. Baker, supra, 136 F.Supp. at page 548). While this may be true insofar as it applies to the deportation hearing itself, the necessary basis for the affirmation of the order of deportation involved a judicial determination that there had been a crime committed against the United States and her laws. Third, in considering the effect of the decision in the Strassheim case, supra, it was concluded that some further act would have to be done by the alien within the United States in order to have some effect within the United States. We do not think that such a limitation can be read into the Strassheim case. There, the Supreme court held that the basis for jurisdiction was the production of

---

15. An earlier Ninth Circuit case, Yen-kichi Ito v. United States, 9 Cir., 1933, 64 F.2d 73, 75, contains language in support of the territorial theory of jurisdiction. It is not applicable here, however, since the court found that there was no legislative intent to extend the operation of the statute in question outside the territorial limits of the United States, and it did not have to decide the effect of such an extension.

some detrimental effect within the territorial limits of the state asserting jurisdiction. Id., 221 U.S. at page 285, 31 S.Ct. at page 560, 55 L.Ed. 735. When a crime coming within the scope of the protective theory of jurisdiction is involved, that detrimental effect takes place through the effect upon the sovereignty of the state. For these reasons we are unable to follow the decision in the Baker case,[16] and think our holding is not contrary to Strassheim v. Daily, supra.

 The alleged criminal acts having been committed in foreign countries, venue for trial is specified by § 3238, Title 18 U.S.C.A., as the district in which the offender is first found. Sec. 3238 is clearly authorized by Art. III, Sec. 2, cl. 3 of the Constitution, supra. The aliens entered this country at San Ysidro, California, a port of entry on the Mexican-American border within this district; were apprehended within the district and were indicted here.[17] Proper venue has been shown.

### Conclusion

We accordingly hold that § 1546, Title 18 U.S.C.A., is constitutionally valid as applied to the crimes charged in the indictment, committed outside of the United States, where the defendant is subsequently apprehended within the United States. As a crime against the sovereignty of the state, the very existence of the state provides authority to Congress to prohibit its commission. In addition, the crimes charged fit in that category of crimes which the law of nations recognizes as offenses against sovereignty and within the express power of Congress to fashion penal legislation concerning offenses "against the Law of Nations," Art. I, Sec. 8, Clause 10. Finally Congress was expressly authorized in Art. III, Sec. 2, Clause 3 to provide for the place of trial when the crime has not been "committed within any State."

The motions to dismiss the indictment are denied.

---

16. See, United States v. Menere, D.C.S.D. N.Y.1956, 145 F.Supp. 88, distinguishing the Baker case from a prosecution under Title 18 U.S.C.A. § 2199, concerning the prosecution of stowaways; 45 Cal.L.Rev. 199 (1956).

17. For violations of Title 8, Chap. 12, Sub-Chapter II, § 1329 provides that prosecution of aliens for improper entry may be held wherever the violation occurs or wherever the alien may be apprehended.