(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HEIEN *v.* NORTH CAROLINA

### CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

No. 13–604.   Argued October 6, 2014—Decided December 15, 2014

Following a suspicious vehicle, Sergeant Matt Darisse noticed that only one of the vehicle's brake lights was working and pulled the driver over.  While issuing a warning ticket for the broken brake light, Darisse became suspicious of the actions of the two occupants and their answers to his questions.  Petitioner Nicholas Brady Heien, the car's owner, gave Darisse consent to search the vehicle.  Darisse found cocaine, and Heien was arrested and charged with attempted trafficking.  The trial court denied Heien's motion to suppress the seized evidence on Fourth Amendment grounds, concluding that the vehicle's faulty brake light gave Darisse reasonable suspicion to initiate the stop.  The North Carolina Court of Appeals reversed, holding that the relevant code provision, which requires that a car be "equipped with a stop lamp," N. C. Gen. Stat. Ann. §20–129(g), requires only a single lamp—which Heien's vehicle had—and therefore the justification for the stop was objectively unreasonable.  Reversing in turn, the State Supreme Court held that, even assuming no violation of the state law had occurred, Darisse's mistaken understanding of the law was reasonable, and thus the stop was valid.

*Held*: Because Darisse's mistake of law was reasonable, there was reasonable suspicion justifying the stop under the Fourth Amendment. Pp. 4–13.

   (a) The Fourth Amendment requires government officials to act reasonably, not perfectly, and gives those officials "fair leeway for enforcing the law," *Brinegar* v. *United States*, 338 U. S. 160, 176. Searches and seizures based on mistakes of fact may be reasonable. See, *e.g., Illinois* v. *Rodriguez*, 497 U. S. 177, 183–186.  The limiting factor is that "the mistakes must be those of reasonable men." *Brinegar*, *supra*, at 176.  Mistakes of law are no less compatible with the concept of reasonable suspicion, which arises from an under-

standing of both the facts and the relevant law. Whether an officer is reasonably mistaken about the one or the other, the result is the same: the facts are outside the scope of the law. And neither the Fourth Amendment's text nor this Court's precedents offer any reason why that result should not be acceptable when reached by a reasonable mistake of law.

More than two centuries ago, this Court held that reasonable mistakes of law, like those of fact, could justify a certificate of probable cause. *United States* v. *Riddle*, 5 Cranch 311, 313. That holding was reiterated in numerous 19th-century decisions. Although *Riddle* was not a Fourth Amendment case, it explained the concept of probable cause, which this Court has said carried the same "fixed and well known meaning" in the Fourth Amendment, *Brinegar*, *supra,* at 175, and n. 14, and no subsequent decision of this Court has undermined that understanding. The contrary conclusion would be hard to reconcile with the more recent precedent of *Michigan* v. *DeFillippo*, 443 U. S. 31, where the Court, addressing the validity of an arrest made under a criminal law later declared unconstitutional, held that the officers' reasonable assumption that the law was valid gave them "abundant probable cause" to make the arrest, *id.,* at 37. Heien attempts to recast *DeFillippo* as a case solely about the exclusionary rule, not the Fourth Amendment itself, but *DeFillippo*'s express holding is that the arrest was constitutionally valid because the officers had probable cause. See *id.,* at 40. Heien misplaces his reliance on cases such as *Davis* v. *United States*, 564 U. S. ___, where any consideration of reasonableness was limited to the separate matter of remedy, not whether there was a Fourth Amendment violation in the first place.

Heien contends that the rationale that permits reasonable errors of fact does not extend to reasonable errors of law, arguing that officers in the field deserve a margin of error when making factual assessments on the fly. An officer may, however, also be suddenly confronted with a situation requiring application of an unclear statute. This Court's holding does not discourage officers from learning the law. Because the Fourth Amendment tolerates only objectively reasonable mistakes, cf. *Whren* v. *United States*, 517 U. S. 806, 813, an officer can gain no advantage through poor study. Finally, while the maxim "Ignorance of the law is no excuse" correctly implies that the State cannot impose punishment based on a mistake of law, it does not mean a reasonable mistake of law cannot justify an investigatory stop. Pp. 4–12.

  (b) There is little difficulty in concluding that Officer Darisse's error of law was reasonable. The North Carolina vehicle code that requires "a stop lamp" also provides that the lamp "may be incorpo-

Syllabus

rated into a unit with one or more other rear lamps," N. C. Gen. Stat. Ann. §20–129(g), and that "all originally equipped rear lamps" must be "in good working order," §20–129(d). Although the State Court of Appeals held that "rear lamps" do not include brake lights, the word "other," coupled with the lack of state-court precedent interpreting the provision, made it objectively reasonable to think that a faulty brake light constituted a violation. Pp. 12–13.

367 N. C. 163, 749 S. E. 2d 278, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined. KAGAN, J., filed a concurring opinion, in which GINSBURG, J., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–604

_____

## NICHOLAS BRADY HEIEN, PETITIONER *v.* NORTH CAROLINA

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

[December 15, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Fourth Amendment prohibits "unreasonable searches and seizures." Under this standard, a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake. An officer might, for example, stop a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat. The driver has not violated the law, but neither has the officer violated the Fourth Amendment.

But what if the police officer's reasonable mistake is not one of fact but of law? In this case, an officer stopped a vehicle because one of its two brake lights was out, but a court later determined that a single working brake light was all the law required. The question presented is whether such a mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold the seizure under the Fourth Amendment. We hold that it can. Because the officer's mistake about the brake-light law was

reasonable, the stop in this case was lawful under the Fourth Amendment.

## I

On the morning of April 29, 2009, Sergeant Matt Darisse of the Surry County Sheriff's Department sat in his patrol car near Dobson, North Carolina, observing northbound traffic on Interstate 77. Shortly before 8 a.m., a Ford Escort passed by. Darisse thought the driver looked "very stiff and nervous," so he pulled onto the interstate and began following the Escort. A few miles down the road, the Escort braked as it approached a slower vehicle, but only the left brake light came on. Noting the faulty right brake light, Darisse activated his vehicle's lights and pulled the Escort over. App. 4–7, 15–16.

Two men were in the car: Maynor Javier Vasquez sat behind the wheel, and petitioner Nicholas Brady Heien lay across the rear seat. Sergeant Darisse explained to Vasquez that as long as his license and registration checked out, he would receive only a warning ticket for the broken brake light. A records check revealed no problems with the documents, and Darisse gave Vasquez the warning ticket. But Darisse had become suspicious during the course of the stop—Vasquez appeared nervous, Heien remained lying down the entire time, and the two gave inconsistent answers about their destination. Darisse asked Vasquez if he would be willing to answer some questions. Vasquez assented, and Darisse asked whether the men were transporting various types of contraband. Told no, Darisse asked whether he could search the Escort. Vasquez said he had no objection, but told Darisse he should ask Heien, because Heien owned the car. Heien gave his consent, and Darisse, aided by a fellow officer who had since arrived, began a thorough search of the vehicle. In the side compartment of a duffle bag, Darisse found a sandwich bag containing cocaine. The officers

arrested both men. 366 N. C. 271, 272–273, 737 S. E. 2d 351, 352–353 (2012); App. 5–6, 25, 37.

The State charged Heien with attempted trafficking in cocaine. Heien moved to suppress the evidence seized from the car, contending that the stop and search had violated the Fourth Amendment of the United States Constitution. After a hearing at which both officers testified and the State played a video recording of the stop, the trial court denied the suppression motion, concluding that the faulty brake light had given Sergeant Darisse reasonable suspicion to initiate the stop, and that Heien's subsequent consent to the search was valid. Heien pleaded guilty but reserved his right to appeal the suppression decision. App. 1, 7–10, 12, 29, 43–44.

The North Carolina Court of Appeals reversed. 214 N. C. App. 515, 714 S. E. 2d 827 (2011). The initial stop was not valid, the court held, because driving with only one working brake light was not actually a violation of North Carolina law. The relevant provision of the vehicle code provides that a car must be

> "equipped with a stop lamp on the rear of the vehicle. The stop lamp shall display a red or amber light visible from a distance of not less than 100 feet to the rear in normal sunlight, and shall be actuated upon application of the service (foot) brake. The stop lamp may be incorporated into a unit with one or more other rear lamps." N. C. Gen. Stat. Ann. §20–129(g) (2007).

Focusing on the statute's references to "a stop lamp" and "[t]he stop lamp" in the singular, the court concluded that a vehicle is required to have only one working brake light—which Heien's vehicle indisputably did. The justification for the stop was therefore "objectively unreasonable," and the stop violated the Fourth Amendment. 214 N. C. App., at 518–522, 714 S. E. 2d, at 829–831.

The State appealed, and the North Carolina Supreme Court reversed. 366 N. C. 271, 737 S. E. 2d 351. Noting that the State had chosen not to seek review of the Court of Appeals' interpretation of the vehicle code, the North Carolina Supreme Court assumed for purposes of its decision that the faulty brake light was not a violation. *Id.,* at 275, 737 S. E. 2d, at 354. But the court concluded that, for several reasons, Sergeant Darisse could have reasonably, even if mistakenly, read the vehicle code to require that both brake lights be in good working order. Most notably, a nearby code provision requires that "all originally equipped rear lamps" be functional. *Id.,* at 282–283, 737 S. E. 2d, at 358–359 (quoting N. C. Gen. Stat. Ann. §20–129(d)). Because Sergeant Darisse's mistaken understanding of the vehicle code was reasonable, the stop was valid. "An officer may make a mistake, including a mistake of law, yet still act reasonably under the circumstances. . . . [W]hen an officer acts reasonably under the circumstances, he is not violating the Fourth Amendment." *Id.,* at 279, 737 S. E. 2d, at 356.

The North Carolina Supreme Court remanded to the Court of Appeals to address Heien's other arguments for suppression (which are not at issue here). *Id.,* at 283, 737 S. E. 2d, at 359. The Court of Appeals rejected those arguments and affirmed the trial court's denial of his motion to suppress. ___ N. C. App. ___, 741 S. E. 2d 1 (2013). The North Carolina Supreme Court affirmed in turn. 367 N. C. 163, 749 S. E. 2d 278 (2013). We granted certiorari. 572 U. S. ___ (2014).

## II

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or
things to be seized."

A traffic stop for a suspected violation of law is a "sei-
zure" of the occupants of the vehicle and therefore must be
conducted in accordance with the Fourth Amendment.
*Brendlin* v. *California*, 551 U. S. 249, 255–259 (2007). All
parties agree that to justify this type of seizure, officers
need only "reasonable suspicion"—that is, "a particular-
ized and objective basis for suspecting the particular
person stopped" of breaking the law. *Prado Navarette* v.
*California*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 3) (inter-
nal quotation marks omitted). The question here is
whether reasonable suspicion can rest on a mistaken
understanding of the scope of a legal prohibition. We hold
that it can.

As the text indicates and we have repeatedly affirmed,
"the ultimate touchstone of the Fourth Amendment is
'reasonableness.'" *Riley* v. *California*, 573 U. S. \_\_\_, \_\_\_
(2014) (slip op., at 5) (some internal quotation marks
omitted). To be reasonable is not to be perfect, and so the
Fourth Amendment allows for some mistakes on the part
of government officials, giving them "fair leeway for en-
forcing the law in the community's protection." *Brinegar*
v. *United States*, 338 U. S. 160, 176 (1949). We have
recognized that searches and seizures based on mistakes
of fact can be reasonable. The warrantless search of a
home, for instance, is reasonable if undertaken with the
consent of a resident, and remains lawful when officers
obtain the consent of someone who reasonably appears to
be but is not in fact a resident. See *Illinois* v. *Rodriguez*,
497 U. S. 177, 183–186 (1990). By the same token, if
officers with probable cause to arrest a suspect mistakenly
arrest an individual matching the suspect's description,
neither the seizure nor an accompanying search of the

arrestee would be unlawful.  See *Hill* v. *California*, 401
U. S. 797, 802–805 (1971).  The limit is that "the mistakes
must be those of reasonable men."  *Brinegar*, *supra,* at
176.

But reasonable men make mistakes of law, too, and such
mistakes are no less compatible with the concept of rea-
sonable suspicion.  Reasonable suspicion arises from the
combination of an officer's understanding of the facts and
his understanding of the relevant law.  The officer may be
reasonably mistaken on either ground.  Whether the facts
turn out to be not what was thought, or the law turns out
to be not what was thought, the result is the same: the
facts are outside the scope of the law.  There is no reason,
under the text of the Fourth Amendment or our prece-
dents, why this same result should be acceptable when
reached by way of a reasonable mistake of fact, but not
when reached by way of a similarly reasonable mistake of
law.

The dissent counters that our cases discussing probable
cause and reasonable suspicion, most notably *Ornelas* v.
*United States*, 517 U. S. 690, 696–697 (1996), have con-
tained "scarcely a peep" about mistakes of law.  *Post*, at 2–3
(opinion of SOTOMAYOR, J.).  It would have been surpris-
ing, of course, if they had, since none of those cases in-
volved a mistake of law.

Although such recent cases did not address mistakes of
law, older precedents did.  In fact, cases dating back two
centuries support treating legal and factual errors alike in
this context.  Customs statutes enacted by Congress not
long after the founding authorized courts to issue certifi-
cates indemnifying customs officers against damages suits
premised on unlawful seizures.  See, *e.g.,* Act of Mar. 2,
1799, ch. 22, §89, 1 Stat. 695–696.  Courts were to issue
such certificates on a showing that the officer had "rea-
sonable cause"—a synonym for "probable cause"—for the
challenged seizure.  *Ibid.*; see *Stacey* v. *Emery*, 97 U. S.

642, 646 (1878); *United States* v. *Riddle*, 5 Cranch 311 (1809). In *United States* v. *Riddle*, a customs officer seized goods on the ground that the English shipper had violated the customs laws by preparing an invoice that undervalued the merchandise, even though the American consignee declared the true value to the customs collector. Chief Justice Marshall held that there had been no violation of the customs law because, whatever the shipper's intention, the consignee had not actually attempted to defraud the Government. Nevertheless, because "the construction of the law was liable to some question," he affirmed the issuance of a certificate of probable cause: "A doubt as to the true construction of the *law* is as reasonable a cause for seizure as a doubt respecting the fact." *Id.*, at 313.

This holding—that reasonable mistakes of law, like those of fact, would justify certificates of probable cause—was reiterated in a number of 19th-century decisions. See, *e.g., The Friendship*, 9 F. Cas. 825, 826 (No. 5,125) (CC Mass. 1812) (Story, J.); *United States* v. *The Reindeer*, 27 F. Cas. 758, 768 (No. 16,145) (CC RI 1848); *United States* v. *The Recorder*, 27 F. Cas. 723 (No. 16,130) (CC SDNY 1849). By the Civil War, there had been "numerous cases in which [a] captured vessel was in no fault, and had not, under a true construction of the law, presented even ground of suspicion, and yet the captor was exonerated because he acted under an honest mistake of the law." *The La Manche*, 14 F. Cas. 965, 972 (No. 8,004) (D Mass. 1863).

*Riddle* and its progeny are not directly on point. Chief Justice Marshall was not construing the Fourth Amendment, and a certificate of probable cause functioned much like a modern-day finding of qualified immunity, which depends on an inquiry distinct from whether an officer has committed a constitutional violation. See, *e.g., Carroll* v. *Carman, ante,* at 7 (*per curiam*). But Chief Justice Marshall was nevertheless explaining the concept of probable

cause, which, he noted elsewhere, "in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion." *Locke* v. *United States*, 7 Cranch 339, 348 (1813). We have said the phrase "probable cause" bore this "fixed and well known meaning" in the Fourth Amendment, see *Brinegar*, *supra,* at 175, and n. 14, and *Riddle* illustrates that it encompassed suspicion based on reasonable mistakes of both fact and law. No decision of this Court in the two centuries since has undermined that understanding.*

The contrary conclusion would be hard to reconcile with a much more recent precedent. In *Michigan* v. *DeFillippo*, 443 U. S. 31 (1979), we addressed the validity of an arrest made under a criminal law later declared unconstitutional. A Detroit ordinance that authorized police officers to stop and question individuals suspected of criminal activity also made it an offense for such an individual "to refuse to identify himself and produce evidence of his identity." *Id.,* at 33. Detroit police officers sent to investigate a report of public intoxication arrested Gary DeFillippo after he failed to identify himself. A search incident to arrest uncovered drugs, and DeFillippo was charged with possession of a controlled substance. The Michigan Court of Appeals ordered the suppression of the drugs, concluding that the identification ordinance was unconstitutionally vague and that DeFillippo's arrest was therefore invalid. *Id.,* at 34–35.

—————

*The dissent contends that "the tolerance of mistakes of law in cases like *Riddle* was a result of the specific customs statute that Congress had enacted." *Post*, at 8, n. 3 (citing *The Apollon*, 9 Wheat. 362, 373 (1824) (Story, J.)). The relevant portion of *The Apollon*, however, addressed "the *effect* of probable cause," not what gave rise to it. *Id.*, at 372 (emphasis added); see *id.,* at 376 (finding it "unnecessary" to decide whether probable cause existed because it "would not, under the circumstances of this case, constitute a valid defence"). Justice Story understandably did not cite *Riddle* or discuss its tolerance of mistakes of law anywhere in *The Apollon*.

Accepting the unconstitutionality of the ordinance as a given, we nonetheless reversed. At the time the officers arrested DeFillippo, we explained, "there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance." *Id.,* at 37. Acknowledging that the outcome might have been different had the ordinance been "grossly and flagrantly unconstitutional," we concluded that under the circumstances "there was abundant probable cause to satisfy the constitutional prerequisite for an arrest." *Id.,* at 37–38.

The officers were wrong in concluding that DeFillippo was guilty of a criminal offense when he declined to identify himself. That a court only *later* declared the ordinance unconstitutional does not change the fact that DeFillippo's conduct was lawful when the officers observed it. See *Danforth* v. *Minnesota*, 552 U. S. 264, 271 (2008). But the officers' assumption that the law was valid was reasonable, and their observations gave them "abundant probable cause" to arrest DeFillippo. 443 U. S., at 37. Although DeFillippo could not be prosecuted under the identification ordinance, the search that turned up the drugs was constitutional.

Heien struggles to recast *DeFillippo* as a case solely about the exclusionary rule, not the Fourth Amendment itself. In his view, the officers' mistake of law resulted in a violation the Fourth Amendment, but suppression of the drugs was not the proper remedy. We did say in a footnote that suppression of the evidence found on DeFillippo would serve none of the purposes of the exclusionary rule. See *id.,* at 38, n. 3. But that literally marginal discussion does not displace our express holding that the arrest was constitutionally valid because the officers had probable cause. See *id.,* at 40. Nor, contrary to Heien's suggestion, did either *United States* v. *Leon*, 468 U. S. 897 (1984), or *Illinois* v. *Gates*, 462 U. S. 213 (1983), somehow erase that

holding and transform *DeFillippo* into an exclusionary rule decision. See Brief for Petitioner 28–29. In *Leon*, we said *DeFillippo* paid "attention to the purposes underlying the exclusionary rule," but we also clarified that it did "not involv[e] the scope of the rule itself." 468 U. S., at 911–912. As for *Gates*, only Justice White's separate opinion (joined by no other Justice) discussed *DeFillippo*, and it acknowledged that "*DeFillippo* did not modify the exclusionary rule itself" but instead "upheld the validity of an arrest." 462 U. S., at 256, n. 12 (opinion concurring in judgment).

Heien is correct that in a number of decisions we have looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all. See, *e.g., Davis* v. *United States*, 564 U. S. ___, ___ (2011) (slip op., at 11) (exclusionary rule); *Illinois* v. *Krull*, 480 U. S. 340, 359–360 (1987) (exclusionary rule); *Wilson* v. *Layne*, 526 U. S. 603, 615 (1999) (qualified immunity); *Anderson* v. *Creighton*, 483 U. S. 635, 641 (1987) (qualified immunity). In those cases, however, we had already found or assumed a Fourth Amendment violation. An officer's mistaken view that the conduct at issue did *not* give rise to such a violation—no matter how reasonable—could not change that ultimate conclusion. See Brief for Respondent 29–31; Brief for United States as *Amicus Curiae* 30, n. 3. Any consideration of the reasonableness of an officer's mistake was therefore limited to the separate matter of remedy.

Here, by contrast, the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place. None of the cases Heien or the dissent cites precludes a court from considering a reasonable mistake of law in addressing that question. Cf. *Herring* v.

*United States*, 555 U. S. 135, 139 (2009) (assuming a Fourth Amendment violation while rejecting application of the exclusionary rule, but noting that "[w]hen a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation").

Heien also contends that the reasons the Fourth Amendment allows some errors of fact do not extend to errors of law. Officers in the field must make factual assessments on the fly, Heien notes, and so deserve a margin of error. In Heien's view, no such margin is appropriate for questions of law: The statute here either requires one working brake light or two, and the answer does not turn on anything "an officer might suddenly confront in the field." Brief for Petitioner 21. But Heien's point does not consider the reality that an officer may "suddenly confront" a situation in the field as to which the application of a statute is unclear—however clear it may later become. A law prohibiting "vehicles" in the park either covers Segways or not, see A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 36–38 (2012), but an officer will nevertheless have to make a quick decision on the law the first time one whizzes by.

Contrary to the suggestion of Heien and *amici*, our decision does not discourage officers from learning the law. The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law— must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. Cf. *Whren* v. *United States*, 517 U. S. 806, 813 (1996). And the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-

bound to enforce.

Finally, Heien and *amici* point to the well-known maxim, "Ignorance of the law is no excuse," and contend that it is fundamentally unfair to let police officers get away with mistakes of law when the citizenry is accorded no such leeway. Though this argument has a certain rhetorical appeal, it misconceives the implication of the maxim. The true symmetry is this: Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law. If the law required two working brake lights, Heien could not escape a ticket by claiming he reasonably thought he needed only one; if the law required only one, Sergeant Darisse could not issue a valid ticket by claiming he reasonably thought drivers needed two. But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop. And Heien is not appealing a brake-light ticket; he is appealing a cocaine-trafficking conviction as to which there is no asserted mistake of fact or law.

## III

Here we have little difficulty concluding that the officer's error of law was reasonable. Although the North Carolina statute at issue refers to "*a* stop lamp," suggesting the need for only a single working brake light, it also provides that "[t]he stop lamp may be incorporated into a unit with one or more *other* rear lamps." N. C. Gen. Stat. Ann. §20–129(g) (emphasis added). The use of "other" suggests to the everyday reader of English that a "stop lamp" is a type of "rear lamp." And another subsection of the same provision requires that vehicles "have all originally equipped rear lamps or the equivalent in good working order," §20–129(d), arguably indicating that if a vehi-

cle has multiple "stop lamp[s]," all must be functional.

The North Carolina Court of Appeals concluded that the "rear lamps" discussed in subsection (d) do not include brake lights, but, given the "other," it would at least have been reasonable to think they did. Both the majority and the dissent in the North Carolina Supreme Court so concluded, and we agree. See 366 N. C., at 282–283, 737 S. E. 2d, at 358–359; *id.,* at 283, 737 S. E. 2d, at 359 (Hudson, J., dissenting) (calling the Court of Appeals' decision "surprising"). This "stop lamp" provision, moreover, had never been previously construed by North Carolina's appellate courts. See *id.,* at 283, 737 S. E. 2d, at 359 (majority opinion). It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop.

The judgment of the Supreme Court of North Carolina is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–604

_____

## NICHOLAS BRADY HEIEN, PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

[December 15, 2014]

JUSTICE KAGAN, with whom JUSTICE GINSBURG joins, concurring.

I concur in full in the Court's opinion, which explains why certain mistakes of law can support the reasonable suspicion needed to stop a vehicle under the Fourth Amendment. In doing so, the Court correctly emphasizes that the "Fourth Amendment tolerates only . . . *objectively* reasonable" mistakes of law. *Ante*, at 11. And the Court makes clear that the inquiry into whether an officer's mistake of law counts as objectively reasonable "is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity." *Ibid.* I write separately to elaborate briefly on those important limitations.[1]

First, an officer's "subjective understanding" is irrelevant: As the Court notes, "[w]e do not examine" it at all.

_____

[1] I note in addition, as does the Court, that one kind of mistaken legal judgment—an error about the contours of the Fourth Amendment itself—can never support a search or seizure. See *ante,* at 10 ("An officer's mistaken view that" conduct does "*not* give rise to" a Fourth Amendment violation, "no matter how reasonable," cannot change a court's "ultimate conclusion" that such a violation has occurred). As the Solicitor General has explained, mistakes about the requirements of the Fourth Amendment "violate the Fourth Amendment even when they are reasonable." Brief for United States as *Amicus Curiae* 30, n. 3; see Brief for Respondent 29 (stating the same view).

*Ibid.* That means the government cannot defend an of-
ficer's mistaken legal interpretation on the ground that
the officer was unaware of or untrained in the law. And it
means that, contrary to the dissenting opinion in the court
below, an officer's reliance on "an incorrect memo or train-
ing program from the police department" makes no differ-
ence to the analysis. 366 N. C. 271, 284, 737 S. E. 2d 351,
360 (2012) (Hudson, J., dissenting). Those considerations
pertain to the officer's subjective understanding of the law
and thus cannot help to justify a seizure.

Second, the inquiry the Court permits today is more
demanding than the one courts undertake before awarding
qualified immunity. See Tr. of Oral Arg. 51 (Solicitor
General stating that the two tests "require essentially the
opposite" showings); Brief for Respondent 31–32 (making
a similar point). Our modern qualified immunity doctrine
protects "all but the plainly incompetent or those who
knowingly violate the law." *Ashcroft* v. *al-Kidd*, 563 U. S.
___, ___ (2011) (slip op., at 12) (quoting *Malley* v. *Briggs*,
475 U. S. 335, 341 (1986)). By contrast, Justice Story's
opinion in *The Friendship*, 9 F. Cas. 825, 826 (No. 5,125)
(CC Mass. 1812) (cited *ante,* at 7), suggests the appropri-
ate standard for deciding when a legal error can support a
seizure: when an officer takes a reasonable view of a "vex-
ata questio" on which different judges "h[o]ld opposite
opinions." See Brief for United States as *Amicus Curiae*
26 (invoking that language). Or to make the same point
without the Latin, the test is satisfied when the law at
issue is "so doubtful in construction" that a reasonable
judge could agree with the officer's view. *The Friendship*,
9 F. Cas., at 826.

A court tasked with deciding whether an officer's mis-
take of law can support a seizure thus faces a straightfor-
ward question of statutory construction. If the statute is
genuinely ambiguous, such that overturning the officer's
judgment requires hard interpretive work, then the officer

has made a reasonable mistake. But if not, not. As the Solicitor General made the point at oral argument, the statute must pose a "really difficult" or "very hard question of statutory interpretation." Tr. of Oral Arg. 50. And indeed, both North Carolina and the Solicitor General agreed that such cases will be "exceedingly rare." Brief for Respondent 17; Tr. of Oral Arg. 48.

The Court's analysis of Sergeant Darisse's interpretation of the North Carolina law at issue here appropriately reflects these principles. As the Court explains, see *ante*, at 12–13*,* the statute requires every car on the highway to have "a stop lamp," in the singular. N. C. Gen. Stat. Ann. §20–129(g) (2007). But the statute goes on to state that a stop lamp (or, in more modern terminology, brake light) "may be incorporated into a unit with one or more *other* rear lamps," suggesting that a stop lamp itself qualifies as a rear lamp. *Ibid.* (emphasis added). And the statute further mandates that every car have "*all* originally equipped rear lamps . . . in good working order." §20–129(d) (emphasis added). The North Carolina Court of Appeals dealt with the statute's conflicting signals in one way (deciding that a brake light is *not* a rear lamp, and so only one needs to work); but a court could easily take the officer's view (deciding that a brake light *is* a rear lamp, and if a car comes equipped with more than one, as modern cars do, all must be in working order). The critical point is that the statute poses a quite difficult question of interpretation, and Sergeant Darisse's judgment, although overturned, had much to recommend it. I therefore agree with the Court that the traffic stop he conducted did not violate the Fourth Amendment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–604

_____

## NICHOLAS BRADY HEIEN, PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

[December 15, 2014]

JUSTICE SOTOMAYOR, dissenting.

The Court is, of course, correct that "'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Riley* v. *California*, 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 5). But this broad statement simply sets the standard a court is to apply when it conducts its inquiry into whether the Fourth Amendment has been violated. It does not define the categories of inputs that courts are to consider when assessing the reasonableness of a search or seizure, each of which must be independently justified. What this case requires us to decide is whether a police officer's understanding of the law is an input into the reasonableness inquiry, or whether this inquiry instead takes the law as a given and assesses an officer's understanding of the facts against a fixed legal yardstick.

I would hold that determining whether a search or seizure is reasonable requires evaluating an officer's understanding of the facts against the actual state of the law. I would accordingly reverse the judgment of the North Carolina Supreme Court, and I respectfully dissent from the Court's contrary holding.

I

It is common ground that Heien was seized within the meaning of the Fourth Amendment. Such a seizure com-

ports with the Constitution only if the officers had articulable and reasonable suspicion that Heien was breaking the law. In *Ornelas* v. *United States*, 517 U. S. 690, 696 (1996), we explained that the "principal components" of that determination "will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." We described this kind of determination as "a mixed question of law and fact": "'[T]he issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" *Id.,* at 696–697 (quoting *Pullman-Standard* v. *Swint*, 456 U. S 273, 289, n. 19 (1982)). What matters, we said, are the facts as viewed by an objectively reasonable officer, and the rule of law—not an officer's conception of the rule of law, and not even an officer's reasonable misunderstanding about the law, but the law.

As a result, when we have talked about the leeway that officers have in making probable-cause determinations, we have focused on their assessments of facts. See, *e.g., Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968) (framing the question as whether the "facts" give rise to reasonable suspicion). We have conceded that an arresting officer's state of mind does not factor into the probable-cause inquiry, "except for *the facts* that he knows." *Devenpeck* v. *Alford*, 543 U. S. 146, 153 (2004) (emphasis added). And we have said that, to satisfy the reasonableness requirement, "what is generally demanded of the many *factual determinations* that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois* v. *Rodriguez*, 497 U. S. 177, 185 (1990) (emphasis added). There is scarcely a peep in these cases to suggest that an officer's understanding or concep-

tion of anything other than the facts is relevant.

This framing of the reasonableness inquiry has not only been focused on officers' understanding of the facts, it has been justified in large part based on the recognition that officers are generally in a superior position, relative to courts, to evaluate those facts and their significance as they unfold. In other words, the leeway we afford officers' factual assessments is rooted not only in our recognition that police officers operating in the field have to make quick decisions, see *id.,* at 186, but also in our understanding that police officers have the expertise to "dra[w] inferences and mak[e] deductions . . . that might well elude an untrained person." *United States* v. *Cortez*, 449 U. S. 411, 418 (1981). When officers evaluate unfolding circumstances, they deploy that expertise to draw "conclusions about human behavior" much in the way that "jurors [do] *as factfinders*." *Ibid.* (emphasis added).

The same cannot be said about legal exegesis. After all, the meaning of the law is not probabilistic in the same way that factual determinations are. Rather, "the notion that the law is definite and knowable" sits at the foundation of our legal system. *Cheek* v. *United States*, 498 U. S. 192, 199 (1991). And it is courts, not officers, that are in the best position to interpret the laws.

Both our enunciation of the reasonableness inquiry and our justification for it thus have always turned on an officer's factual conclusions and an officer's expertise with respect to those factual conclusions. Neither has hinted at taking into account an officer's understanding of the law, reasonable or otherwise.

## II

Departing from this tradition means further eroding the Fourth Amendment's protection of civil liberties in a context where that protection has already been worn down. Traffic stops like those at issue here can be "annoy-

ing, frightening, and perhaps humiliating." *Terry*, 392 U. S., at 25; see *Delaware* v. *Prouse*, 440 U. S. 648, 657 (1979). We have nevertheless held that an officer's subjective motivations do not render a traffic stop unlawful. *Whren* v. *United States*, 517 U. S. 806 (1996). But we assumed in *Whren* that when an officer acts on pretext, at least that pretext would be the violation of an actual law. See *id.,* at 810 (discussing the three provisions of the District of Columbia traffic code that the parties accepted the officer had probable cause to believe had been violated). Giving officers license to effect seizures so long as they can attach to their reasonable view of the facts some reasonable legal interpretation (or misinterpretation) that suggests a law has been violated significantly expands this authority. Cf. *Barlow* v. *United States*, 7 Pet. 404, 411 (1833) (Story, J.) ("There is scarcely any law which does not admit of some ingenious doubt"). One wonders how a citizen seeking to be law-abiding and to structure his or her behavior to avoid these invasive, frightening, and humiliating encounters could do so.

In addition to these human consequences—including those for communities and for their relationships with the police—permitting mistakes of law to justify seizures has the perverse effect of preventing or delaying the clarification of the law. Under such an approach, courts need not interpret statutory language but can instead simply decide whether an officer's interpretation was reasonable. Indeed, had this very case arisen after the North Carolina Supreme Court announced its rule, the North Carolina Court of Appeals would not have had the occasion to interpret the statute at issue. Similarly, courts in the Eighth Circuit, which has been the only Circuit to include police mistakes of law in the reasonableness inquiry, have observed that they need not decide interpretive questions under their approach. See, *e.g., United States* v. *Rodriguez-*

*Lopez*, 444 F. 3d 1020, 1022–1023 (CA8 2006).[1]   This result is bad for citizens, who need to know their rights and responsibilities, and it is bad for police, who would benefit from clearer direction.  Cf. *Camreta* v. *Greene*, 563 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 10–11) (recognizing the importance of clarifying the law).

Of course, if the law enforcement system could not function without permitting mistakes of law to justify seizures, one could at least argue that permitting as much is a necessary evil.  But I have not seen any persuasive argument that law enforcement will be unduly hampered by a rule that precludes consideration of mistakes of law in the reasonableness inquiry.  After all, there is no indication that excluding an officer's mistake of law from the reasonableness inquiry has created a problem for law enforcement in the overwhelming number of Circuits which have adopted that approach.  If an officer makes a stop in good faith but it turns out that, as in this case, the officer was wrong about what the law proscribed or required, I know of no penalty that the officer would suffer.  See 366 N. C. 271, 286–288, 737 S. E. 2d 351, 361–362 (2012) (Hudson, J., dissenting) (observing that "officers (rightfully) face no punishment for a stop based on a mistake of law").  Moreover, such an officer would likely have a defense to any civil suit on the basis of qualified immun-

———————

[1] Every other Circuit to have squarely addressed the question has held that police mistakes of law are not a factor in the reasonableness inquiry.  See *United States* v. *Miller*, 146 F. 3d 274, 279 (CA5 1998); *United States* v. *McDonald*, 453 F. 3d 958, 962 (CA7 2006); *United States* v. *King*, 244 F. 3d 736, 741 (CA9 2001); *United States* v. *Nicholson*, 721 F. 3d 1236, 1244 (CA10 2013); *United States* v. *Chanthasouxat*, 342 F. 3d 1271, 1279–1280 (CA11 2003).  Five States have agreed.  See *Hilton* v. *State*, 961 So. 2d 284, 298 (Fla. 2007); *State* v. *Louwrens*, 792 N. W. 2d 649, 652 (Iowa 2010); *Martin* v. *Kansas Dept. of Revenue*, 285 Kan. 625, 637–639, 176 P. 3d 938, 948 (2008); *State* v. *Anderson*, 683 N. W. 2d 818, 823–824 (Minn. 2004); *State* v. *Lacasella*, 313 Mont. 185, 193–195, 60 P. 3d 975, 981–982 (2002).

ity. See *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___ (2011) (slip op., at 12) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions").

Nor will it often be the case that any evidence that may be seized during the stop will be suppressed, thanks to the exception to the exclusionary rule for good-faith police errors. See, *e.g., Davis* v. *United States*, 564 U. S. ___, ___–___ (2011) (slip op., at 8–9). It is true that, unlike most States, North Carolina does not provide a good-faith exception as a matter of state law, see *State* v. *Carter*, 322 N. C. 709, 721–724, 370 S. E. 2d 553, 560–562 (1988), but North Carolina recognizes that it may solve any remedial problems it may perceive on its own, see *id.,* at 724, 370 S. E. 2d, at 562; N. C. Gen. Stat. Ann. §15A–974 (2013) (statutory good-faith exception).[2] More fundamentally, that is a remedial concern, and the protections offered by the Fourth Amendment are not meant to yield to accommodate remedial concerns. Our jurisprudence draws a sharp "analytica[l] distinct[ion]" between the existence of a

─────────────

[2] In addition to North Carolina, it appears that 13 States do not provide a good-faith exception. See *State* v. *Marsala*, 216 Conn. 150, 151, 579 A. 2d 58, 59 (1990); *Dorsey* v. *State*, 761 A. 2d 807, 814 (Del. 2000); *Gary* v. *State*, 262 Ga. 573, 574–575, 422 S. E. 2d 426, 428 (1992); *State* v. *Guzman*, 122 Idaho 981, 998, 842 P. 2d 660, 677 (1992); *State* v. *Cline*, 617 N. W. 2d 277, 283 (Iowa 2000), abrogated on other grounds by *State* v. *Turner*, 630 N. W. 2d 601 (Iowa 2001); *Commonwealth* v. *Upton*, 394 Mass. 363, 370, n. 5, 476 N. E. 2d 548, 554, n. 5 (1985); *State* v. *Canelo*, 139 N. H. 376, 383, 653 A. 2d 1097, 1102 (1995); *State* v. *Johnson*, 168 N. J. 608, 622–623, 775 A. 2d 1273, 1281–1282 (2001); *State* v. *Gutierrez*, 116 N. M. 431, 432, 863 P. 2d 1052, 1053 (1993); *People* v. *Bigelow*, 66 N. Y. 2d 417, 427, 488 N. E. 2d 451, 457–458 (1985); *Commonwealth* v. *Edmunds*, 526 Pa. 374, 376, 586 A. 2d 887, 888 (1991); *State* v. *Oakes*, 157 Vt. 171, 173, 598 A. 2d 119, 121 (1991); *State* v. *Afana*, 169 Wash. 2d 169, 184, 233 P. 3d 879, 886 (2010); see also *People* v. *Krueger*, 175 Ill. 2d 60, 61, 76, 675 N. E. 2d 604, 606, 612 (1996) (limiting the exception to situations where police have a warrant).

Fourth Amendment violation and the remedy for that violation. *Davis*, 564 U. S., at \_\_\_ (slip op., at 14).

In short, there is nothing in our case law requiring us to hold that a reasonable mistake of law can justify a seizure under the Fourth Amendment, and quite a bit suggesting just the opposite. I also see nothing to be gained from such a holding, and much to be lost.

## III

In reaching the contrary conclusion, the Court makes both serious legal and practical errors. On the legal side, the Court barely addresses *Ornelas* and the other cases that frame the reasonableness inquiry around factual determinations. Instead, in support of its conclusion that reasonable suspicion "arises from the *combination* of an officer's understanding of the facts *and* his understanding of the relevant law," *ante,* at 6 (emphasis added), the Court first reaches to founding-era customs statutes and cases applying those statutes. It concedes, however, that these cases are "not directly on point" because they say nothing about the scope of the Fourth Amendment and are instead equivalents of our modern-day qualified immunity jurisprudence for civil damages. *Ante,* at 7.

The only link in the tenuous chain the Court constructs between those cases and this one that has anything to say about the Fourth Amendment is *Brinegar* v. *United States*, 338 U. S. 160 (1949). See *ante*, at 8. But all that our opinion in *Brinegar* actually says is that probable cause exists where "'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." 338 U. S., at 175–176 (quoting *Carroll* v. *United States*, 267 U. S. 132, 162 (1925)). It thus states the uncontroversial proposition that the probable-cause inquiry looks to the reasonable-

ness of an officer's understanding of the facts. Indeed, *Brinegar* is an odd case for the Court to rely on given that, like the cases I discussed above, it subsequently emphasizes that "the mistakes must be those of reasonable men, acting on *facts* leading sensibly to their conclusions of probability." 338 U. S., at 176 (emphasis added). Again, reasonable understandings of the facts, not reasonable understandings of what the law says.[3]

Further, the Court looks to our decision in *Michigan* v. *DeFillippo*, 443 U. S. 31 (1979). This is a Fourth Amendment case, but the Court's reading of it imagines a holding that is not rooted in the logic of the opinion. We held in *DeFillippo* that an officer had probable cause to support an arrest even though the ordinance that had allegedly been violated was later held by the Michigan Court of Appeals to be unconstitutional. This was so, we explained, because the officer conducted an arrest after having observed conduct that was criminalized by a presumptively valid law at the time of that conduct. See *id.*, at 37 ("At th[e] time [of the arrest], of course, there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance"). We noted that it would have been wrong for that officer not to enforce the law in that situation. See *id.,* at 38 ("Police are charged to enforce laws until and unless they are declared unconstitutional. . . . Society would be ill-served if its police officers took

_____

[3] The Court in fact errs even earlier in the chain when it represents *United States* v. *Riddle*, 5 Cranch 311 (1809), as containing some broad proposition. *Ante*, at 6–7. As Justice Story explained in a later case, the tolerance of mistakes of law in cases like *Riddle* was a result of the specific customs statute that Congress had enacted. *The Apollon*, 9 Wheat. 362, 373 (1824) (explaining that findings of probable cause "ha[d] never been supposed to excuse any seizure, *except* where some statute creates and defines the exemption from damages" (emphasis added)).

it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement").

*DeFillippo* thus did not involve any police "mistake" at all. Rather, *DeFillippo* involved a police officer correctly applying the law that was then in existence and that carried with it a presumption of validity. Here, by contrast, police stopped Heien on suspicion of committing an offense that never actually existed. Given that our holding in *DeFillippo* relied so squarely on the existence of a law criminalizing the defendant's conduct, and on the presumption of validity that attends actual laws, it can hardly be said to control where, as here, no law ever actually criminalized Heien's conduct.

On the practical side, the Court primarily contends that an officer may confront "a situation in the field as to which the application of a statute is unclear." *Ante*, at 11. One is left to wonder, however, why an innocent citizen should be made to shoulder the burden of being seized whenever the law may be susceptible to an interpretive question. Moreover, the Court fails to reconcile its belief that the Fourth Amendment gives officers leeway to address situations where the application of a criminal statute may be unclear with our prior assumption that the Fourth Amendment does not give officers such leeway where they rely on a statute that authorizes police conduct that may violate the Fourth Amendment. See *Illinois* v. *Krull*, 480 U. S. 340, 355, n. 12, 359 (1987). Nor does it engage with the analytic consequences of North Carolina's similar concession that it does not mean to claim "that an officer's mistaken understanding of the Fourth Amendment itself can support a seizure if that understanding was reasonable." Brief for Respondent 29. It is not clear why an officer's mistaken understanding of other laws should be viewed differently.

While I appreciate that the Court has endeavored to set some bounds on the types of mistakes of law that it thinks

will qualify as reasonable, and while I think that the set of
reasonable mistakes of law ought to be narrowly circum-
scribed if they are to be countenanced at all, I am not at
all convinced that the Court has done so in a clear way. It
seems to me that the difference between qualified immun-
ity's reasonableness standard—which the Court insists
without elaboration does not apply here—and the Court's
conception of reasonableness in this context—which re-
mains undefined—will prove murky in application. See
*ante,* at 11. I fear the Court's unwillingness to sketch a
fuller view of what makes a mistake of law reasonable
only presages the likely difficulty that courts will have
applying the Court's decision in this case.

*             *             *

To my mind, the more administrable approach—and the
one more consistent with our precedents and principles—
would be to hold that an officer's mistake of law, no matter
how reasonable, cannot support the individualized suspi-
cion necessary to justify a seizure under the Fourth
Amendment. I respectfully dissent.